UNITED STATES DISTRICT COURT         <ins>ELECTRONIC PUBLICATION ONLY</ins>
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                    :

KEVIN DELANEY, THOMAS FITZGERALD,   :
JOHN KAPLUN, JOHN LANDI,               :
DAVID MANGENE, KENT MITCHELL,      :
CHRIS PICCOLA, ROBERT SERVISS,       :
JOHN E. SMITH, and PETER WONG,       :
                                      :            MEMORANDUM
                     Plaintiffs,      :            <ins>AND ORDER</ins>
           - against -                 :
                                      :
RAY LAHOOD, In His Official Capacity as    :            07-CV-471 (JG) (WDW)
Secretary, United States Department of      :
Transportation, and the UNITED STATES     :
DEPARTMENT OF TRANSPORTATION,      :
                                      :
                     Defendants.     :
------------------------------------------------------------- X

A P P E A R A N C E S :

         THE LAW OFFICES OF DAVID S. FEATHER
                666 Old Country Road, Suite 304
                Garden City, NY 11530
         By:     David S. Feather, Esq.
                Attorney for Plaintiffs

         BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East (610 Federal Plaza, 5th Fl.)
                Brooklyn, NY 11201-4859 (Central Islip, NY 11722-4454)
         By:     Vincent Lipari
                Attorney for Defendants

JOHN GLEESON, United States District Judge:

         Kevin Delaney, Thomas Fitzgerald, John Kaplun, John Landi, David Mangene,

Kent Mitchell, Chris Piccola, Robert Serviss, John E. Smith and Peter Wong bring this

employment discrimination action against the United States Department of Transportation

("DOT") and its secretary, Ray LaHood,[1] asserting unlawful sex and race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* Specifically, plaintiffs allege that (1) they were put on administrative leave in July 2005 and terminated in October 2005 due to discrimination against them because they are white males, and (2) after they were reinstated in December 2005 pursuant to an agreement reached at arbitration, they were subjected to various acts of retaliation. The defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted.

BACKGROUND[2]

Plaintiffs are ten past or current air traffic controllers employed by the Federal Aviation Administration ("FAA"), an operating division of the DOT, at the New York Terminal Radar Approach Control ("TRACON") facility in Westbury, New York. For the purposes of the instant motion, I accept the undisputed facts as true and resolve the disputed facts in favor of the plaintiffs where there is evidence to support their versions of the events.

A.    *The Investigation Leading to the Administrative Leave and Termination of Plaintiffs*

On July 9, 2002, DOT Deputy Assistant Inspector General for Aviation, David A. Dobbs, notified DOT Assistant Inspector General for Investigations, Charles H. Lee, of the potential abuse of Workers' Compensation traumatic injury claims by TRACON air traffic controllers. As a result of an audit, Dobbs had determined that many primarily stress-related claims, which involved the same diagnosing physicians, appeared "questionable, at best" and merited investigation. DOT's 56.1 Statement ¶ 7 & Ex. B. The matter was referred to the DOT Inspector General ("DOT IG") for further action. *Id.*

---

[1]    The action was originally filed against Mary E. Peters, then-Secretary of the DOT.
[2]    The following facts, except where otherwise noted, are undisputed and are drawn from DOT's Rule 56.1 Statement of Undisputed Material Facts ("DOT's 56.1 Statement").

DOT IG Special Agent Daniel Helzner investigated the allegations, focusing on whether Workers' Compensation claims filed by TRACON air traffic controllers warranted referral to the Department of Labor Inspector General ("DOL IG"). The DOL IG, and not the DOT IG, has the jurisdiction to pursue administrative and criminal action related to Workers' Compensation claims because the DOL administers the Workers' Compensation program. DOT's 56.1 Statement ¶ 8 & Ex. C ("Helzner Dep.") at 28. Helzner conducted his investigation by reviewing documents such as Workers' Compensation claims and supporting medical records. He also visited TRACON on numerous occasions during the period from August 2002 to June 2005, where he met with Irene Grefe, an Employee Development Specialist at TRACON, and other members of management. DOT's 56.1 Statement ¶ 9; Helzner Dep. at 24; Pls.' 56.1 Statement ¶ 9 & Exs. I, S. Helzner did not meet any of the air traffic controllers who were the subjects of the investigation until he testified at the arbitration in December 2005. DOT's 56.1 Statement ¶ 9; Helzner Dep. at 21-23*.[3]

In late 2002 or early 2003, Helzner informed the DOL IG of the TRACON air traffic controllers' questionable Workers' Compensation claims. However, the DOL IG did not indicate that it intended to take any action. DOT's 56.1 Statement ¶ 10; Helzner Dep. at 28. In the beginning of 2003, Helzner shifted the focus of his investigation to determining whether the air traffic controllers had disclosed the medical conditions and treatment underlying their Workers' Compensation claims on their FAA Airmen Medical Certificate Form 8500-8 ("8500"). DOT's 56.1 Statement ¶ 11; Helzner Dep. at 30-32, 40*.

---

[3]    Because certain pages of the deposition transcripts were missing from the Exhibit Binder submitted in conjunction with DOT's 56.1 Statement, I ordered the government to supply the missing pages. *See* Docket Entry No. 46. The government produced the missing pages accordingly on May 21, 2009. *See* Docket Entry No. 47. Rather than cite to both submissions when referencing an exhibit that was missing a page, an asterisk (*) will connote a citation that required supplement.

Air traffic controllers must obtain medical certification on a regular basis to work. To be medically certified, an air traffic controller must undergo a physical examination by an FAA-approved physician on or about his or her birthday and forward a completed 8500 to the FAA flight surgeon for review. DOT's 56.1 Statement ¶ 12, Ex. D & Ex. E ("Piccola Dep.") at 15-17. Form 8500 states that an air traffic controller must (1) make full voluntary self-disclosure at box 18 of his or her medical history, and (2) list all visits to health professionals within three years at box 19. In addition, by signing his or her name in box 20 of the 8500, an air traffic controller "certif[ies] that all statements and answers provided … are complete and true to the best of [his or her] knowledge." DOT's 56.1 Statement ¶ 13 & Ex. D at 1.

Based on his review of Workers' Compensation records, Helzner decided additional investigation was warranted for 20 air traffic controllers. Specifically, the question was whether they disclosed on their 8500s the conditions and treatment underlying their Workers' Compensation claims. Helzner was not aware at that time of the race or ethnicity of these 20 individuals. DOT's 56.1 Statement ¶ 14; Helzner Dep. at 22-23*. Plaintiffs contest the defendants' assertion that Helzner alone -- without the consult of management officials from TRACON -- determined which 20 individuals would be investigated. DOT's 56.1 Statement ¶ 14; Pls.' 56.1 Statement ¶ 14. Because it does not concern a fact that is material for the purposes of this motion, resolution of this disputed issue is not necessary.

By a March 7, 2003 memorandum to Warren Silberman, the manager of the FAA Aeromedical Certification Division, and a March 24, 2003 memorandum to Dr. Harriet Lester, the regional flight surgeon for the eastern region, Helzner's supervisor, William Owens, requested 8500s for the 20 individuals under investigation, including the 10 plaintiffs in this

action.[4]  DOT's 56.1 Statement ¶ 15 & Exs. F, G.  Owens received 8500s for each of those

individuals except for Frederick Jones.  Plaintiffs' 56.1 Statement ¶ 15.

B.    *The Reports of Investigation*

          Based on a comparison of the Workers' Compensation records to the

corresponding 8500s on which disclosure would be required, Helzner prepared 14 Reports of

Investigation ("ROIs"): one for each of the ten plaintiffs here and one each for four non-parties

(Hong, Lindholm, Mark Boyer and Henry).  The ROIs recited facts, set forth the evidence

collected, and attached relevant documents.  DOT's 56.1 Statement ¶ 16.  They referred the 14

individuals because each had omitted medical information on his 8500 that he had used as the

basis for a Workers' Compensation claim with the DOL.  The DOT IG's office did not have the

authority to take disciplinary action against FAA employees, nor did it make any

recommendation as to what action, if any, the deciding officials should take.  DOT's 56.1

Statement ¶ 17; Helzner Decl. of May 21, 2009 (submitted as Ex. B to DOT's May 21, 2009

supplemental submission), ¶ 6; Helzner's arbitration testimony of Dec. 5, 2005 (submitted as Ex.

C to DOT's May 21, 2009 supplemental submission) at 174-76.

          Helzner did not compile an ROI for (or refer) Manuel Lugris or Raymond

Maldonado (both of whom allegedly received preferential treatment because they are Hispanic)

for any action because Lugris and Maldonado disclosed on their 8500s their medical conditions

and visits underlying their Workers' Compensation claims that were being investigated.  DOT's

56.1 Statement ¶ 18-19 & Exs. I, J; Helzner Dep. at 80-81*.  According to defendants, Helzner

did not compile an ROI for or refer Frederick Jones (who allegedly received preferential

treatment because he is African-American) for any action because Jones's 8500 had not been

_____

[4]          In addition to the 10 named plaintiffs, 8500s were requested for Roger Bender, Joanne Boyer,
Mark Boyer, Thomas Crist, Charles Henry, Wuon Hong, Frederick Jones, Steven Lindholm, Manuel Lugris and
Raymond Maldonado.  DOT's 56.1 Statement ¶ 15.

due, was not completed and thus was not forwarded when the DOT IG requested and received 8500s in March 2003. Jones's 8500 for the pertinent period was not submitted until June 13, 2003. DOT's 56.1 Statement ¶ 20. Plaintiffs dispute the facts about Jones's 8500 and state that Helzner had or should have had Jones's 8500 from years prior to 2003, upon which Jones had omitted information and/or made false statements. Plaintiffs' 56.1 Statement ¶ 20 & Ex. D. Here again, it is not necessary to resolve this dispute because it does not concern a fact that is material to the outcome of the motion.

In addition, ROIs were not compiled and no referrals were made for the three remaining individuals for whom 8500s had been requested in the March 2003 memoranda. No action was taken with respect to Thomas Crist because he had disclosed on his 8500 the medical condition that was the basis for his Workers' Compensation claim. Roger Bender retired in April 2004, before the ROIs were compiled and sent. Joanne Boyer was in the process of being removed from the FAA as of February 2004, before the ROIs were compiled and sent. DOT's 56.1 Statement ¶ 21 & Ex. C at 67, 108*; Helzner Decl. of May 21, 2009, ¶ 4.

C.    *The Administrative Leaves and Removals of Plaintiffs*

In July 2005, ROIs for the ten plaintiffs and for non-plaintiff Wuon Hong, all of whom continued to work at the New York TRACON, were directed to Jeffrey Clarke, the Air Traffic Manager of the New York TRACON. The ROIs for non-plaintiffs Lindholm, Henry and Boyer were not forwarded to Clarke because they were no longer employed at New York TRACON. DOT's 56.1 Statement ¶ 22 and Ex. L; Helzner arbitration testimony of Dec. 5, 2005 at 176-77; Helzner Decl. of May 21, 2009, ¶¶ 7-9.[5]

---

[5]    The parties dispute whether Clarke had involvement in or knowledge of DOT IG's investigation prior to July 2005, when he received the ROIs. DOT's 56.1 Statement ¶ 23; Pls.' 56.1 Statement ¶ 23. This fact is not material to the resolution of this motion, so I need not resolve the dispute.

After consulting with Human Resources and regional counsel, Clarke issued Notices of Proposed Removal, dated July 28, 2005, to each of the 11 air traffic controllers whose ROIs were referred to him. The notices specified the basis for the proposed removal (failure to disclose on the 8500 medical information used to make Workers' Compensation claims) and provided an opportunity to contest the proposed action. A few days later, the air traffic controllers were placed on paid administrative leave pending a final decision. DOT's 56.1 Statement ¶ 24 & Ex. L at 103-107*.

By notice dated August 19, 2005, Dean Iacopelli, the president of the plaintiffs' union, the National Air Traffic Controllers Association ("NATCA"), filed a grievance regarding the proposed removal under the provisions of Article 9 of the parties' collective bargaining agreement. DOT's 56.1 Statement ¶ 25 & Exs. N, O. In relevant part, Article 9, section 4, allows allegations of discrimination to be raised in the grievance procedures. It states:

> In matters relating to Title 5 U.S.C. 2302(b)(1) dealing with certain discriminatory practices, an aggrieved employee shall have the option of utilizing this grievance procedure or any other procedure available in law or regulation, but not both.

DOT's 56.1 Statement ¶ 25. However, discrimination claims were not alleged in the grievance.

In a letter dated September 9, 2005, William W. Osborne, Jr., NATCA-appointed counsel for the 10 plaintiffs and Wuon Hong, responded to the 11 notices of proposed removal. He argued, among other things, that the TRACON controllers had not committed any misconduct and that the discipline imposed was too severe and violative of the factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313, 5 M.S.P.R. 280 (MSPB 1981). DOT's 56.1 Statement ¶ 26 & Ex. P. Clarke rejected those contentions and terminated the 11 air traffic controllers by Notices of Removal dated October 14, 2005. DOT's 56.1 Statement ¶ 27 & Ex.

Q. As a result, NATCA requested and received consolidation and expedited arbitration of the 11

cases. DOT's 56.1 Statement ¶ 28 & Ex. R.

D.    *The Arbitration*

Arbitration proceedings were held on November 7 and December 5, 7 and 8,

2005. DOT's 56.1 Statement ¶ 29 & Ex. S. At the arbitration, plaintiffs did not raise any

allegations of discrimination. On December 7, 2005, plaintiffs' counsel, Osborne, asked Clarke,

who is African-American, the following questions on cross-examination:

> [BY MR. OSBORNE]: Did you ever talk to [Dean Iacopelli, the president of
> NATCA] about controllers Jones and Maldonado?
> A: Yes, we have had a discussion about Jones and Maldonado.
> Q: That they were on one of these lists and yet they weren't disciplined?
> A: Yes.
> Q: I am not suggesting you to tell me that that is accurate, but there was a
> discussion about a Mr. Jones and a Mr. Maldonado?
> A: Yes there was a discussion about it.
> Q: They are working today?
> A: Yes.
> …
> Q: There was some question about them [Jones and Maldonado] being on an IG
> list with respect to their 8500 forms?
> A: Kind of like that. I called him [Dean Iacopelli] about a rumor I heard.
> Q: Fair enough. I am not trying to get into it more than that.

DOT's 56.1 Statement ¶ 30 & Ex. S at 490-92. On redirect examination by the FAA's attorney,

Elizabeth Head, Clarke testified about the relevance of Mr. Iacopelli's inquiry:

> [BY MS. HEAD]: What was the point of Mr. Iacopelli's inquiry to you about
> those two individuals [Jones and Maldonado]? Do you remember that?
> A: He really didn't inquire to me. I inquired to him. I asked him -- I told him I
> heard a very ugly rumor.
> Q: What was the rumor?
> A: The rumor was that I had manipulated the list of people and I did not want to
> take disciplinary action against any black people so I took the names Ray
> Maldonado, and I believe it is, Freddy Jones, off the list. So I told him that that
> was a pretty ugly rumor and it was pretty offensive to me that anyone would start
> a rumor like that. And he said that he had also heard that rumor. He says, "I want
> to assure you that NATCA did not start that rumor."

> MR. OSBORNE: That is not a position we have taken or are taking in this case, period.
>
> ARBITRATOR JAFFE: Thank you for that clarification.

DOT's 56.1 Statement ¶ 31 & Ex. S at 538-39.

When the testimony concluded on December 8, 2005, the parties jointly asked the arbitrator to mediate settlement discussions, which included *ex parte* discussions addressing the merits. DOT's 56.1 Statement ¶ 32 & Ex. S at 616, 619. Before proceeding to mediate a settlement, the arbitrator detailed how the process would be conducted and specifically requested and received the consent of each individual plaintiff. DOT's 56.1 Statement ¶ 32 & Ex. S at 627-631.

The mediated settlement discussions were successful. On December 9, 2005, the parties entered into, and the arbitrator signed, a Stipulated Award under which plaintiffs would be reinstated, with certain back pay, less an agreed-upon unpaid suspension. The Stipulated Award provided:

> At the close of the evidentiary record on December 8, 2005, the Parties requested that I attempt to facilitate a resolution of these disputes. … After protracted mediation, the Parties reached an agreement settling each of the grievances and asked that I memorialize their agreement in the form of a Stipulated Award. The Parties are to be commended for finding terms that resolved this dispute. I find that these terms are eminently fair, reasonable, and responsible given the facts and circumstances which led to the removals in these cases. It should also be noted that each of the individual Grievants expressly noted their consent to the terms of the settlement and to the entry of this Stipulated Award. … This Stipulated Award resolves, in full, all claims arising out of the removals of the Grievants or the instant grievances.

DOT's 56.1 Statement ¶ 33 & Ex. T.

E.    *Plaintiff's EEO Proceedings*

The plaintiffs returned to work on December 12, 2005. Thereafter, each plaintiff contacted an Equal Employment Opportunity ("EEO") counselor and filed an EEO complaint,

alleging that: (1) their removals had been motivated by discrimination against them because they are all white males; and (2) upon returning to work they had been subjected to various acts of discrimination and retaliation.  DOT's 56.1 Statement ¶ 34 & Exs. U1-U10.  The following plaintiffs first contacted an EEO counselor on the following dates:

| | |
|---|---|
| John Kaplun - | January 19, 2006 (DOT's 56.1 Statement, Ex. V7) |
| John Landi - | January 19, 2006 (*Id.* Ex. V8) |
| John Smith - | January 19, 2006 (*Id.* Ex. V10) |
| Kevin Delaney - | January 20, 2006 (*Id.* Ex. V6) |
| Robert Serviss - | January 20, 2006 (*Id.* Ex. V9) |
| Christopher Piccola - | January 23, 2006 (*Id.* Ex. V4) |
| Peter Wong - | January 24, 2006 (*Id.* Ex. V5) |
| Thomas Fitzgerald - | February 6, 2006 (*Id.*, Ex. V1) |
| Kent Mitchell - | February 9, 2006 (*Id.* Ex. V3) |
| David Mangene - | February 23, 2006 (*Id.* Ex. V2) |

Each of the plaintiffs' EEO complaints was dismissed, and with the exception of Delaney's, all the complaints were consolidated for the purposes of appeal to the E.E.O.C. Office of Federal Operations, which then affirmed the dismissal, initially by decision dated November 6, 2006, and on reconsideration by decision dated January 25, 2007.  DOT's 56.1 Statement ¶ 37 & Exs. W, X.  In relevant part, the E.E.O.C. ruled that: (1) plaintiffs elected to challenge their dismissal through the negotiated grievance procedures, which permitted them to raise allegations of discrimination, and thus could not maintain claims under the statutory procedures, *i.e*., Title VII, 42 U.S.C. § 2000e, *et seq*.; and (2) plaintiffs' claims of retaliation were meritless as a matter of law.

Delaney, who claimed, among other things, that he had been constructively discharged, appealed the dismissal of his EEO complaint in a proceeding before the Merit Systems Protection Board,  *Delaney v. Department of Transportation*, NY-0752-07-0128-1-1.  In a decision dated June 10, 2008, the board affirmed the administrative law judge's decision that Delaney failed to prove a constructive discharge.  DOT's 56.1 Statement ¶ 38 & Ex. Y.  Delaney

appealed that decision to the United States Court of Appeals for the Federal Circuit, which, on April 3, 2009, affirmed the dismissal.  DOT's 56.1 Statement ¶ 38 & Ex. Z.

The issue of back pay was raised in the grievance that led to the arbitration, and back pay was ordered by the arbitrator's Stipulated Award.  DOT's 56.1 Statement ¶ 43 & Ex. T. On January 13, 2006, plaintiffs filed another grievance challenging the defendants' calculation of back pay.  DOT's 56.1 Statement ¶ 43 & Ex. CC.  The grievance was denied on February 2, 2006, and the parties did not appeal the denial.  DOT's 56.1 Statement ¶ 43 & Ex. DD.

F.      *The Instant Action*

Plaintiffs filed their complaint on February 2, 2007.  An amended complaint (adding Delaney as a plaintiff) was filed on October 5, 2007, alleging (1) discrimination based on race and gender and (2) retaliation.  Plaintiffs seek back pay, front pay, benefits and compensatory damages in an amount to be determined at trial, plus attorney's fees.  In addition, they seek a money judgment for nonpecuniary losses such as mental anguish and pain and suffering.

1.      *Plaintiffs' Individual Claims of Retaliation*

Plaintiffs alleged 29 incidents of retaliation in their amended complaint (though they failed to specify the target of each retaliatory act).  They alleged additional incidents of retaliation in their responses to question 3 of Defendants' First Set of Interrogatories ("Interrogatory Response" or "IR").  DOT's 56.1 Statement ¶ 39 & Exs. A, AA.  Some plaintiffs added further claims in their affidavits submitted in connection with their opposition to the instant motion.[6]  Plaintiffs' individual claims of retaliation are set forth below.

---

[6]      Numerous plaintiffs allege acts of retaliation in their affidavits filed in connection with their opposition to the instant motion that were not alleged previously in their EEO complaints, the amended complaint in this action or in the Interrogatory Response.  Accordingly, they are not properly before me now.  Nevertheless, these claims are all dismissed for the various reasons stated below.

a.    *John Landi*

Landi alleged the following acts of retaliation in his EEO complaint, dated April 26, 2006: (1) after he was reinstated, he received comments from his supervisors that he must have done something wrong to have been fired; (2) he did not receive all of the back pay allegedly owed to him under the Stipulated Award; and (3) he had to "rectify a situation concerning [his] lack of health insurance, whereby there should have been no lapse in coverage."[7]  DOT's 56.1 Statement ¶ 41 & Ex. U4.  In the IR, Landi adds claims that (4) "he was pressured to recertify too quickly after his reinstatement in December 2005"; and (5) in October 2006, William Allen, a supervisor, told him that he "should retire as soon as [he was] eligible -- it's the best thing for you."  DOT's 56.1 Statement ¶ 46-47 & Ex. AA at 13.  In his affidavit filed in this case, Landi added the following claim: (6) that he was forced to complete "an extraordinary amount of extra training" for an operational error.  Landi Aff. ¶ 14.

b.    *Christopher Piccola*

Piccola did not expressly allege any acts of retaliation in his EEO complaint dated April 28, 2006, other than claiming that (1) he did not receive all of the back pay that was due to him under the Stipulated Award.  DOT's 56.1 Statement ¶ 48 & Ex. U7.  In addition, in the IR, Piccola alleges that (2) he was retaliated against when his request for a week off with pay in March 2006 was denied.  DOT's 56.1 Statement ¶ 48 & Ex. AA at 16.

c.    *Kent Mitchell*

In an EEO complaint dated May 1, 2006, Mitchell alleged the following retaliatory acts: (1) he did not receive all of the back pay due to him under the Stipulated Award; (2) he did not receive a timely response to his request for an estimate of his retirement benefits

---

[7]    In the IR and his affidavit, Landi explains that his health insurance was "wrongfully" terminated in or about April 2006, even though he continued to pay premiums out of his wages.  DOT's 56.1 Statement, Ex. AA at 13; Landi Aff. ¶ 14.

(*i.e.*, whereas other controllers received a response within two to four weeks, Mitchell had yet to receive a response after 2 months); and (3) he was subjected to comments by his supervisors and fellow controllers questioning his "veracity and [] work experience." DOT's 56.1 Statement ¶ 50 & Ex. U6. Mitchell alleged no retaliation in his IR. In his affidavit filed in this case, Mitchell added the following claims: (4) after his reinstatement he was told to "watch [his] ass" and that the reinstated controllers were being watched; (5) Ed Sosa, a supervisor, said that the reinstated controllers should not have been reinstated; (6) he overheard comments that FAA would be better off if the reinstated controllers had remained terminated; (7) he was assigned to work on a holiday twice; and (8) he was denied a schedule change in February-April 2006. Mitchell Aff. ¶ 15.

        d.    *David Mangene*

Mangene alleged the following retaliatory acts in his EEO complaint dated April 30, 2006: (1) failure to receive the full amount of back pay that he was due under the Stipulated Award within the required 30 days; and (2) improper denial of leave as well as improper questioning as to the reason for the requested leave. DOT's 56.1 Statement ¶ 52 & Ex. U5. In the IR, Mangene added the following claims of retaliation: (3) Kevin Watson, his supervisor, told him throughout 2006, "You better watch out -- downstairs [management] hates you and will do anything they can to fire you" and "I'm just warning you, they're after you"; and (4) Enzio Powell, a supervisor, followed him in the parking lot on numerous occasions over a six-month period, and on one occasion Powell sat behind him while he was on "position" (directing air traffic); (5) he was charged for leave without pay in November 2005, even though he was terminated as of that time; and (6) his health insurance was wrongfully terminated in approximately April 2006. DOT's 56.1 Statement ¶¶ 53, 55-56 & Ex. AA at 18-19. In his

affidavit filed in this case, Mangene adds the following claims: (7) on his first day back after reinstatement, he was wrongfully accused of having an operational error prior to August 2005 and was forced to undergo additional training as a result; and (8) he was wrongfully counseled for sick leave abuse in January/February 2006.  Mangene Aff. ¶ 12.

   e. *Thomas Fitzgerald*

   In an EEO complaint dated April 27, 2006, Fitzgerald alleged the following acts of retaliation, some of which were elaborated upon in his affidavit and IR: (1) he did not receive the proper amount of back pay that he was due under the Stipulated Award; (2) he was not accorded proper breaks of 40-45 minutes (instead he was allowed only 20-25 minutes) during December 2005/January 2006; (3) he was told by members of management that his name had been brought up in a derogatory fashion during management meetings and that supervisors had been told to "keep an eye on him"; (4) in December 2005/January 2006 he was told by a supervisor from the Newark area, Steve Marotta, to "watch [his] back, they're gunning for you" and by another supervisor, Roger Bender, that management was "gunning for them" and that he should "watch [his] ass"; and (5) he was informed in March 2006 by fellow air traffic controller, Jim Gummerson, that area manager Pete Pellaconi told Fitzgerald's co-workers not to cover for Fitzgerald when he was on break because he "wasn't worth it."  DOT's 56.1 Statement ¶ 57 & Ex. U2.  Fitzgerald's IR added the following claims of retaliation, some of which were elaborated on in his affidavit: (6) a March 2006 request to move from a night shift to a day shift for one day was denied first by Jim Giotta, a supervisor, and then his immediate supervisor, Keith McDonald, who told him he was instructed "to deny any requests from you guys"; (7) he was improperly questioned about his need to take sick time; (8) in connection with donations of annual sick time to him, in November 2006 Clarke sent Fitzgerald a letter stating that he had

failed to substantiate his need for leave and forcing Fitzgerald to resubmit medical documentation; (9) in December 2005, Keith McDonald, a supervisor, told Fitzgerald that he had been instructed "to keep an eye for anything out of the ordinary" with respect to him; and (10) he was informed that at a meeting held two days after he was reinstated management had expressed the view that the arbitration was a "huge victory." DOT's 56.1 Statement ¶ 57-62 & Ex. AA at 13-16; Fitzgerald Aff. ¶ 31.

    f. *Kevin Delaney*

    Delaney worked only three days, December 12, 13 and 20, 2005, after being reinstated. On January 3, 2006, after being out on sick leave, he submitted his written resignation, subsequently claiming constructive discharge. DOT's 56.1 Statement ¶ 63. He contacted an EEO counselor on January 20, 2006. DOT's 56.1 Statement ¶ 63 & Ex. V6. Delaney alleged the following acts of retaliation in his EEO complaint, dated April 19, 2006: (1) on December 13, 2005, he was "medically decertified" (his medical clearance to control air traffic was removed) because he had not updated his medical information; (2) he was not paid for sick leave he "was on prior to his resignation"; (3) he was not properly paid during his last weeks of employment; and (4) his requests for leave without pay and a part time work schedule were unreasonably denied upon his reinstatement. DOT's 56.1 Statement ¶¶ 63-64 & Ex. U1. In his IR, Delaney asserts the following additional claims of retaliation: (5) following his resignation, from March 13, 2006 to August 2008, he was sent notices from the Department of the Interior and DOT claiming that he was overpaid thousands of dollars in salary and demanding refunds because his leave time had been miscategorized when he resigned; (6) he was constructively discharged in January 2006; and (7) he received a bill from the Department of the Interior for a

different individual with the same name. DOT's 56.1 Statement ¶ 66 & Ex. AA at 16-18; Delaney Aff. ¶ 14.

g.     *John Kaplun*

In his May 6, 2006 EEO complaint, Kaplun alleges the following acts of retaliation: (1) back pay and leave were improperly withheld; (2) he was subjected to schedule changes "made for no reason, against the contract;" (3) he was singled out without reason for retraining around the same time he filed his EEO report; and (4) he had "retraining administered against the FAA's own orders." DOT's 56.1 Statement ¶ 67 & Ex. U3. In the IR, Kaplun added the following additional claims of retaliation: (5) he was "wrongfully written up for an operational error in February 2006"; (6) he was denied instructions on completing the application for medical certification in December 2006; (7) he was wrongfully denied FMLA leave in March/April 2007; (8) after reinstatement in 2005 he was told by supervisors to "keep [his] head low," "don't get into trouble," "I don't want to see you get hurt," "you got a year and ten months to go until you're retirement eligible; I don't want to see you getting into trouble;" (9) he was harassed for taking one day of FMLA leave in November 2006 for the death of his father-in-law; and (10) he was wrongfully given a sick leave restriction letter in May/June 2007. DOT's 56.1 Statement ¶¶ 70-72 & Ex. AA at 5-6. In his affidavit filed in this case, Kaplun adds the following claim: (11) that his health insurance was cancelled in the Spring of 2006 and that Ms. Tracy told him never to come to her office again when he went to complain. Kaplun Aff. ¶ 13.

h.     *John Smith*

Smith alleged that he suffered the following retaliatory acts in his EEO complaint dated May 8, 2006: (1) after returning to work he heard a supervisor say, referring to Smith and

the other 11 individuals who were removed, that they "were all 'criminals and scumbags and should never have been allowed to return to service with the FAA'"; (2) on February 16, 2006, he overheard another controller on his cell-phone make a similar remark; (3) no action was taken regarding these comments when Smith complained about the comments to his supervisors; and (4) he did not receive the back pay he was due under the Stipulated Award. DOT's 56.1 Statement ¶ 73 & Ex. U8. Smith alleged in the IR that: (5) in 2006 he was wrongfully precluded from meeting with an EEO counselor; (6) in or about January/February 2006, Smith overheard Ed Sosa, one of his supervisors, state that the individuals who were rehired were "just a bunch of scumbags - they never should have been reinstated;" (7) a fellow traffic controller, Kahil Smith, made similar remarks; (8) his health insurance lapsed in the spring of 2006 and then was wrongfully terminated in May 2006 and as a result he received invoices directly from health care providers; (9) on February 1, 2006, Clarke told Smith, while they approached each other from different ends of the hallway "how are you doing now?" in a "laughing, derogatory manner" that was "extremely intimidating" to Smith; (10) in the spring of 2006, Charlie Hannen, a supervisor, told Smith that the management was told to "watch" the 11 reinstated controllers; (11) in mid- to late-2006, when Smith, who was out with a cold, called in to ask whether he could control air traffic even though he was taking the medication Cipro, his supervisor Ben LeFleur announced on the floor that Smith was contagious and was not allowed back into the sector for 24 hours; (12) Smith's name not relisted on the "Read and Initial" list after he was reinstated and his complaints about the situation to management were ignored; (13) Smith's name was not placed back on his mailbox when he was reinstated and he had to place his name back on his mailbox himself approximately one month later; (14) upon reinstatement, money was not automatically deducted from his paycheck to pay his Thrift Savings Plan ("TSP") loan, and he later had to

make payments manually and ultimately was told he had to pay back the entire TSP loan by December 29, 2006, forcing him to take out a home equity loan with a higher interest rate; and (15) his requests for a special chair because he had a back injury were denied. DOT's 56.1 Statement ¶ 74-77 & Ex. AA at 7-10; Smith Aff. ¶ 13.

   i.  *Robert Serviss*

   In his April 28, 2006 EEO complaint, Serviss asserted the following claims of retaliation: (1) in December 2005, he was denied leave to which he was entitled and, in violation of his union contract, he was questioned regarding the need for the requested leave; (2) he was denied an adequate training program upon his reinstatement in December 2005; (3) in February 2006, three of Serviss's training reports were rejected because he was assigned to train with an instructor who had not met the training requirements (as a result, he was required to complete the training again); (4) he did not receive his back pay under the Stipulated Award; and (5) in mid-January 2006, Clarke sought an ethics violation against him for appearing in a movie about 9/11. DOT's 56.1 Statement ¶ 79 & Ex. U9. In his IR, Serviss alleged three additional incidents of retaliation: (6) in January 2006, defendants violated an oral agreement with NATCA regarding "prime time leave" for the reinstated controllers; (7) on March 28, 2007 he was forced to take sick leave because defendants claimed to have no other facility duties available; (8) in June/July 2007, Serviss was called on numerous occasions to work overtime in violation of applicable rules; and (9) on December 6, 2006, he requested a transfer within the building to a busier sector but never received a response. DOT's 56.1 Statement ¶ 82 & Ex. AA at 6-7; Serviss Aff. ¶ 15 (elaborating on claims previously raised).

   j.  *Peter Wong*

Wong asserted that he suffered the following retaliatory acts in his EEO complaint dated May 10, 2006, to which he added additional detail in the IR: (1) he was not given the back pay due under the Stipulated Award; (2) his health insurance was cancelled in April 2006; and (3) upon his reinstatement he was charged with 56 hours of annual leave that he had never used.  DOT's 56.1 Statement ¶ 84 & Ex. U10.  In the IR, Wong alleged 17 additional incidents of retaliation: (4) after reinstatement in December 2005, defendants made an error on his W2, which necessitated a delay in the filing of his tax return; (5) he was denied annual leave in December 2005; (6) he was medically decertified and was not certified on radar in December 2005; (7) he was denied leave in December 2005; (8) he was wrongfully charged two days of sick leave in December 2005; (9) he was denied shift changes and/or swaps; (10) in December 2005 he was initially denied leave to make the film "Flight 93" (but was eventually granted leave without pay) and his request for an additional week of vacation was denied; (11) he did not get his TSP contribution reinstated until four months after his reinstatement; (12) he was wrongfully counseled regarding sick leave abuse in July 2006; (13) he was denied annual leave during the summer of 2006 and on other occasions; (14) his requests to wear sneakers to work after undergoing knee-surgery were denied; (15) his request to cancel his annual leave in November 2006 was denied; (16) he was denied overtime pay in January 2008; (17) he was given an inadequate raise in January 2008; (18) he was wrongfully given an Operational Error Development Procedure in May 2007, which was place in his personnel file without his knowledge; (19) he was called at home on November 9, 2008 and informed that he lost his medical clearance; and (20) on June 26, 2008 his scheduled overtime for July 28, 2008 was cancelled due to an operational error he had made while training a developmental controller. DOT's 56.1 Statement ¶¶ 85-93 & Ex. AA at 10-12.

## DISCUSSION

A.      *The Summary Judgment Standard of Review*

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, e.g.*, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The moving party must demonstrate that no genuine issue exists as to any material fact. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). However, the party opposing summary judgment "may not rely merely on the allegations or denials in its own pleading; rather, its response must … set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

Once the moving party has met its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Id.* at 586. Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24.

The Second Circuit has provided additional guidance regarding motions for summary judgment in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

B.       *Plaintiffs' Discrimination Claims*

1.       *Plaintiffs' Election to Challenge Their Leave and Termination Claims Under the Negotiated Grievance Procedure Precludes Judicial Review of Those Claims*

The defendants argue that the plaintiffs are precluded from pursuing their discrimination claims under Title VII in federal court because they elected to bring their claims arising out of the administrative leave and removals via a negotiated union grievance procedure. I agree.

Discrimination claims brought by federal employees who are bound by collective bargaining agreements are governed by 5 U.S.C. § 7121 and by an Equal Employment Opportunity Commission ("EEOC") regulation, 29 C.F.R. § 1614.301(a). Pursuant to 5 U.S.C. § 7121(d), an employee covered by a negotiated grievance procedure that permits allegations of discrimination "may raise the matter under a statutory procedure or the negotiated procedure, but not both." *Id.* The statute specifies that an employee "shall be deemed to have exercised his option under this subsection … at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first." *Id.*; *see also* 29 C.F.R. § 1614.301(a) ("An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely written grievance.").

The applicable EEOC regulation provides that an employee who files a grievance with "an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file a[n EEO] complaint on the same matter … irrespective of whether the agency has informed the individual of the need to elect or of *whether the grievance has raised an issue of discrimination*." *Id.* (emphasis added). Moreover, "[a]ny such complaint filed after a grievance has been filed on the same matter shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure including the right to appeal to the Commission from a final decision." *Id.* Whichever route the employee chooses, he must exhaust all applicable administrative remedies prior to pursuing his claim in court. *See O'Dwyer v. Snow*, No. 00 CIV 8918, 2004 WL 444534, at *7 (S.D.N.Y. Mar. 10, 2004). In sum, when claims are brought via a negotiated grievance procedure, plaintiffs are barred from raising claims pertaining to the same matter via a "statutory procedure" and thus, from bringing an

action under Title VII.  *See* 5 U.S.C. § 7121(d); *Fernandez v. Chertoff*, 471 F.3d 45, 52 (2d Cir. 2006) ("By invoking the negotiated procedure, the employee commits to resolving his grievance in accordance with the procedures prescribed in the collective bargaining agreement between his union and his employing agency.").

When deciding whether a plaintiff may seek a statutory remedy for alleged discrimination after previously invoking negotiated grievance procedures, the critical question is whether the claims pertain to the same "matter."  *See* 29 C.F.R. § 1614.301(a); 5 U.S.C. § 7121(d).  "Every court that has considered the issue has concluded that the word 'matter' in 5 U.S.C. § 7121 and 29 C.F.R. § 1614.301 refers to the *conduct* underlying a plaintiff's claim, as opposed to the *legal allegations* in the claim."  *Wright v. Snow*, No. 02 Civ. 7615, 2004 WL 1907687, at *5 (S.D.N.Y. Aug. 25, 2004) (collecting cases); *see also Redmon v. Mineta*, 243 F. App'x 920, 924 (6th Cir. 2007) (plaintiff's EEO charge that alleged discrimination and union grievance dealt with the "same matters" within the meaning of 5 U.S.C. § 7121(d); it was "inconsequential" that "she advanced different legal theories to challenge these actions"); *Giove v. U.S. Dept. of Transp.*, 178 F. App'x 814, 818 (10th Cir. 2006) (under 5 U.S.C. § 7121(d) the term "matter" "refer[s] to the underlying government action which precipitated the complaint," not the legal theory employed to challenge the government action); *Guerra v. Cuomo*, 176 F.3d 547, 550 (D.C. Cir. 1999) (under 5 U.S.C. § 7121(d)  "courts have tended to construe the term 'matter' to encompass more than a legal claim and instead to encompass the 'underlying action' … or the 'topics' raised"); *Bonner v. Merit Sys. Protection Bd.*, 781 F.2d 202, 204-05 (Fed. Cir. 1986) (the word "matter" as used in 5 U.S.C. § 7121 refers to the "underlying [employment] action"); *O'Dwyer*, 2004 WL 444534, at *8 (statutory claim barred notwithstanding the fact that the plaintiff had not actually raised the issue of discrimination in her previous grievances).

As NATCA members, the plaintiffs are covered by NATCA's collective bargaining agreement with the DOT, which permits employees to file grievances alleging discrimination. DOT's 56.1 Statement ¶ 25 & Ex. O at 20-21 (with respect to matters "dealing with certain discriminatory practices, an aggrieved employee shall have the option of utilizing this grievance procedure or any other procedure available in law or regulation, but not both"). Plaintiffs elected to raise the matter of their administrative leaves and removals via the negotiated grievance procedures of the collective bargaining agreement when they filed a grievance on August 19, 2005. DOT's 56.1 Statement ¶ 25 & Ex. N. Although they could have alleged discrimination claims in their grievance, they argued only that they committed no misconduct, and that the discipline imposed was too severe and violative of the factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313, 5 M.S.P.R. 280 (MSPB 1981). DOT's 56.1 Statement ¶ 26 & Ex. P. Only after going to arbitration, entering into the Stipulated Award and being reinstated did plaintiffs raise discrimination claims by filing EEO complaints, which, in addition to retaliation charges, alleged race discrimination as the basis for their suspension and removal. Because the discrimination claims in the EEO complaints pertained to the same "matter" addressed through the negotiated grievance procedures -- plaintiffs' administrative leaves and removals -- the EEOC affirmed the agency's dismissal of the EEO complaints. *Kaplun v. Peters*, 2006 WL 3357961, at *1 (E.E.O.C. Nov. 6, 2006) ("The complainants argue that they did not raise discrimination in their grievances. However, the fact that they chose not to raise their discrimination claims in their grievances does not mean that they can now bifurcate their claims and also file EEO complaints on the same matters."). Plaintiffs' motion for reconsideration of this decision was denied on January 25, 2007. DOT's 56.1 Statement ¶ 37 &

Ex. X. For the same reasons articulated by the EEOC, the plaintiffs are barred in this court from

bringing discrimination claims under Title VII.

Plaintiffs argue that they "did not learn of a potential discriminatory reason for

their suspensions and eventual termination until, at the earliest, at or near the end of the

arbitration hearing in December, 2005." Pls.' Br. at 4. Moreover, they contend that the delay

was "due solely to the Defendants' deliberate withholding of … an unredacted list of names of

other air traffic controllers who had been investigated for the same infraction for which the

plaintiffs were ultimately disciplined." *Id.* This list included the name of Mr. Frederick Jones,

an African-American male, who was not disciplined and who plaintiffs allege was treated

favorably as compared to them because of his race.

Plaintiffs' argument fails under the plain language of 29 C.F.R. § 1614.301(a),

which states that a complaint pertaining to the same matter raised through a union grievance may

not later be filed with the EEOC "irrespective ... of *whether the grievance has raised an issue of

discrimination*." 29 C.F.R. 1614.301(a) (emphasis added); *see also Wright*, 2004 WL 1907687,

at *6 (finding that plaintiff made a binding election even though "she did not even know that

there were grounds to raise a claim of discrimination" until she examined certain documents that

she won the right to examine by grieving her promotion denial) (emphasis omitted); *Garcia v.

M.S.P.B.*, 155 F.3d 570 (Fed. Cir. 1998) (per curiam) (unpublished) (despite plaintiff's assertion

that new evidence of discrimination should allow him an appeal to the MSPB, MSPB correctly

ruled that it lacked jurisdiction over plaintiff's appeal pursuant to 5 U.S.C. § 7121(d) because

plaintiff had elected to file a grievance in which he omitted his discrimination claim); *Nouraie v.

Sullivan*, 61 F.3d 912 (9th Cir. 1995) (unpublished) (no federal court jurisdiction under Title VII

to consider discrimination claims brought for the first time via an EEO complaint challenging

plaintiff's termination subsequent to plaintiff challenging his termination through the negotiated union grievance procedure).

Plaintiffs' contention that they "had no reason to believe that the actions against them by the Defendants were motivated in any fashion by discrimination" until late December 2005-early January 2006 rings hollow given the record in this case. Most plaintiffs indeed testified that they had no knowledge until after the arbitration of the names on the list other than their own because the lists they received were redacted. But plaintiffs' counsel, Osborne, obviously had such knowledge and was acutely aware of the possible race discrimination claim before the arbitration. He specifically questioned Clarke at the hearing about why Maldonado and Jones were on the list but were not disciplined.[8] In addition, Piccola testified that he suspected he had been discriminated against when Osborne showed him and the other terminated controllers the redacted list, on which they could make out the names of Frederick Jones and Ray Maldonado. Lipari Decl. dated May 5, 2009, Ex. D at 36-37, 39-43; *see also* Landi Dep. at 36-37 (Ex. CC to Feather Affirmation dated Apr. 24, 2009) (Landi testifying that he came to believe the terminated controllers were discriminated against "[t]owards the middle of the third day of the arbitration" when "we became aware of the list"); Mangene Dep. at 26 (testifying that he first believed discrimination had occurred at the arbitration when Osborne asked about Jones and Maldonado and the redacted list). Although it is disputed by the other plaintiffs, according to Piccola, Osborne discussed the redacted list with the men and whether to bring it up at the arbitration. *Id*. at 43. Furthermore, Piccola testified that at a meeting in approximately August of 2005 of air traffic controllers who had been placed on leave, he had expressed his belief that

---

[8]     Osborne's questioning of Clarke is set forth on page 8, *supra*.

he had been singled out because of his race and gender.  *Id*. at 27-30.  He also stated that more than one other person at the meeting agreed with him.  *Id*.

It is not necessary to resolve the factual question of whether the plaintiffs had reason to believe they had been subjected to race discrimination at the time they filed their grievance.  Based on the questioning of Clarke at the arbitration (for which the plaintiffs were present) plaintiffs had reason to know there were grounds to raise a claim of discrimination at the latest on December 8, 2005, the last day of the arbitration (when Clarke was questioned).  And plaintiffs concede as much in their brief.  Pls.' Br. at 4 ("It is undisputed that the Plaintiffs herein did not learn of a potential discriminatory reason for their suspensions and eventual termination until, at the earliest, at or near the end of the arbitration hearing in December, 2005.").  Nonetheless, plaintiffs made no efforts during the arbitration to amend their grievance to include discrimination claims.  To the contrary, Osborne clarified that plaintiffs were *not* alleging discrimination.  Responding to Clarke's statement about the rumor that he had manipulated the list of people because he did not want to take disciplinary action against minorities, Osborne stated, "That is not a position we have taken or are taking in this case, period."  Ex. S. at 539.  That disclaimer made it clear that plaintiffs' counsel was both aware of the possibility of a race discrimination claim and had consciously chosen not to assert it.

Plaintiffs did not appeal or otherwise challenge the Stipulated Award, which resolved the "matter."  Rather, they accepted all of the benefits under it.  Moreover, their failure to exhaust the available administrative remedies on the grievances precludes judicial review.[9]

_____

[9]        Prior to bringing a Title VII action in the federal court, an aggrieved employee is required to exhaust his administrative remedies.  In a "pure" discrimination case (one in which solely claims of discrimination are involved), an employee who elects the negotiation grievance procedure must appeal the arbitrator's award to the EEOC before bringing a Title VII action.  *See Fernandez v. Chertoff*, 471 F.3d 45, 53-54 (2d. Cir. 2006).  However, in a mixed case -- one involving both a claim of discrimination and a challenge to other types of prohibited personnel actions -- an employee must appeal the arbitrator's award to the MSPB prior to seeking judicial review.  *Id*. at 53-55.  Here, plaintiffs could have appealed the award to the MSPB, but declined to do so.

Because this court lacks jurisdiction to review plaintiffs' claims that their administrative leaves and terminations were due to discrimination in violation of Title VII, summary judgment is granted for defendants with respect to these claims.

2.    *The Stipulated Award Precludes Review of Plaintiffs' Discrimination Clams*

Plaintiffs' discrimination claims also fail because they were extinguished by the Stipulated Award, which provides in relevant part: "This Stipulated Award resolves, in full, *all claims* arising out of the removals of the Grievants or the instant grievances."  DOT's 56.1 Statement ¶ 33 & Ex. T at 3 (emphasis added).

Plaintiffs were represented by counsel, Mr. Osborne, at the arbitration.  Osborne, together with DOT counsel, asked the arbitrator to mediate settlement discussions and negotiations, the result of which was the Stipulated Award.  *Id.*[10]  Each plaintiff expressly agreed to the terms of the Stipulated Award.  *Id.*; *see also* Lipari Decl. dated May 5, 2009, Ex. D at 46. Thereafter, plaintiffs accepted the benefits of the Stipulated Award: they were reinstated, they received back pay (for the time they had been terminated, less an agreed suspension of a week for all plaintiffs except Fitzgerald, who agreed to a suspension of 30 days), and the Removal Letters in their personnel files were replaced with letters of official reprimand, which could be expunged nine months later.

I see no reason why the Stipulated Award should not preclude plaintiffs' discrimination claims.  Plaintiffs' argument that the Stipulated Award should not be enforced

---

[10]    The Stipulated Award provides, in relevant part:
At the close of the evidentiary record on December 8, 2005, the Parties requested that I attempt to facilitate a resolution of these disputes….  After protracted mediation, the Parties reached an agreement settling each of the grievances and asked that I memorialize their agreement in the form of a Stipulated Award.  The parties are to be commended for finding terms that resolved the dispute.  I find that these terms are eminently fair, reasonable, and responsible given the facts and circumstances that led to the removals in these cases.  It should also be noted that each of the individual Grievants expressly noted their consent to the terms of the settlement and the entry of this Stipulated Award.
DOT's 56.1 Statement ¶ 33, Ex. T.

because they did not personally sign it and were not "parties" to the agreement is meritless. As memorialized in the Stipulated Award, each plaintiff orally agreed to its terms and both Osborne and Natalie C. Moffett, who had the authority to do so as their counsel, signed it "For NATCA and for the Grievants."[11] DOT's 56.1 Statement, Ex. T at 3.

Plaintiffs' contention that they were never informed they were releasing their Title VII claims by agreeing to the Stipulated Award is also unpersuasive. With respect to individually bargained agreements, as opposed to collective bargaining agreements, the release or waiver of Title VII claims must be knowing and voluntary. *See Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 121 (2d Cir. 2008); *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 402 (2d Cir. 1989). The Second Circuit utilizes a "totality of the circumstances" test to determine whether a waiver of claims under Title VII meets this requirement. *See Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1988). The unexhaustive list of factors that may be considered in determining whether a waiver was knowing and willful are:

> (1) the plaintiff's education and business experience, (2) the amount of
> time the plaintiff had possession of or access to the agreement before
> signing it, (3) the role of plaintiff in deciding the terms of the agreement,
> (4) the clarity of the agreement, (5) whether the plaintiff was represented
> by or consulted with an attorney, and (6) whether the consideration given
> in exchange for the waiver exceeds employee benefits to which the
> employee was already entitled by contract or law.

---

[11] At oral argument on May 15, 2009, plaintiffs' counsel argued for the first time that Osborne did not represent the plaintiffs at the arbitration, but rather the union. This argument is frivolous. First, plaintiffs' counsel himself invoked the attorney-client privilege (between Osborne and plaintiffs) no fewer than 10 times during depositions in this case. *See* Defs'. May 21, 2009 Supplemental Submission, Ex. F1-F5. Second, putting aside the fact that plaintiffs themselves expressly agreed to the Stipulated Award, they are bound by its provisions because the "settlement of a grievance by the union and the employer is binding upon the individual employee, absent evidence that the union has acted in bad faith in carrying out its duty of full and fair representation." *Suissa v. American Export Lines, Inc.*, 507 F.2d 1343, 1347 (2d Cir. 1974). Plaintiffs have failed to demonstrate that Osborne or the Union acted in bad faith. In fact, the record shows that NATCA vigorously represented plaintiffs, successfully requesting expedited review of the grievance arising out of the termination and negotiating a settlement under which all of the air traffic controllers were reinstated.

*Bormann*, 875 F.2d at 403 (quoting *EEOC v. American Express Publishing Corp.*, 681 F. Supp. 216, 219 (S.D.N.Y. 1988); *accord Livingston*, 141 F.3d at 438. In addition, courts examine whether an employee was encouraged or discouraged from consulting an attorney and if the employee had a fair opportunity to do so. *Bormann*, 875 F.2d at 403. Not all of the factors need to be satisfied, or examined, for a release to be enforceable. In sum, summary judgment is appropriate where the *Bormann* factors weigh overwhelmingly in favor of defendants. *See, e.g.*, *Tung v. Texaco, Inc.*, 150 F.3d 206, 208 (2d Cir. 1998) (affirming a district court's dismissal of plaintiff's claim because "[w]e agree that, under the totality-of-the-circumstances analysis, [plaintiff]'s waiver of his right to sue under Title VII was knowing and voluntary"); *see also McKoy v. Potter*, No. 01 Civ. 1984, 2002 WL 31028691, at *7-9 (S.D.N.Y. Sept. 12, 2002), *aff'd*, 98 F. App'x 28 (2d Cir. 2004).

Considering the *Bormann* factors, I conclude as a matter of law that under the totality of the circumstances plaintiffs knowingly and willfully waived their Title VII claims. Although the extent of plaintiffs' education and business experience is not clear from the record, plaintiffs are not unsophisticated parties. Most plaintiffs state in their affidavits that they were not given the opportunity to review the Stipulated Award prior to the conclusion of the arbitration, *see, e.g.*, Delaney Aff. ¶11, but at least one plaintiff, Piccola, testified to having its contents described to the group of plaintiffs by Osborne, *see* Lipari Decl. dated May 5, 2009, Ex. D at 45-46, and another testified that he read it before it was agreed to. Pls.' Ex. CC ("Landi Oct. 21, 2008 Dep."), at 36; *but see* Landi Aff. ¶ 11 ("I was not given the opportunity to review the Stipulated Award before union officials signed it."). Most importantly, the agreement was clearly written. The language of the Stipulated Award plainly states that it resolves "all claims" arising out of the removals and subsequent grievances of plaintiffs. Moreover, the plaintiffs

were represented by counsel, and they were given consideration in exchange for the waiver that exceeded benefits to which they were already entitled.

In sum, a jury could reach but one conclusion based on the facts viewed in the light most favorable to the plaintiffs: they knowingly and voluntarily waived their Title VII claims by entering into the Stipulated Award and collecting the benefits to which it entitled them.

Finally, even if the plaintiffs' waivers of their Title VII claims were not knowing and willful, the doctrines of ratification and tender would bar them from challenging the Stipulated Award. "[A] plaintiff who accepts and neither returns nor offers to return the consideration he or she has received for consideration for executing a release, is deemed to have ratified the Release and is thereby barred from challenging its validity." *Tung v. Texaco, Inc.*, 32 F. Supp. 2d 115, 118 (S.D.N.Y. 1997), *aff'd in part and vacated in part,* 150 F.3d 206, 208 (2d Cir. 1998) (vacating with respect to ADEA claim); *see also Livingston v. Bev-Pak, Inc.*, 112 F. Supp. 2d 242, 249 (N.D.N.Y. 2000) ("[E]ven if Plaintiff did not knowingly and voluntarily execute the release agreement [of his Title VII claims], he has since ratified the agreement by inaction."). A "key element" of ratification "is the failure of the plaintiff to tender back … the consideration that he received in exchange for executing the release." *Id*. Plaintiffs ratified the Stipulated Award by failing to tender back the benefits they received. There is no fairness is permitting them to challenge the settlement terms now.

For the foregoing reasons, summary judgment is granted with respect to plaintiffs' discrimination claims.[12]

---

[12]    Because the substantive discrimination claims are dismissed on jurisdictional grounds, I decline to address defendants' additional arguments regarding the timeliness of plaintiffs' invocation of the EEOC remedies or the merits of plaintiffs' discrimination claims.

C.    *Plaintiffs' Retaliation Claims*

Title VII forbids an employer from retaliating against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Whereas Title VII's "substantive [discrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status[,]" the anti-retaliation provision "seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *see also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) ("The allocation of burdens of proof in retaliation cases follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).").  In order to defeat a motion for summary judgment addressed to a claim of retaliation in violation of Title VII, a plaintiff must first present sufficient evidence to make out a prima facie case.  Thus, each air traffic controller must present evidence sufficient to permit a rational trier of fact to find that (1) he engaged in a protected activity under Title VII; (2) DOT was aware of this activity; (3) DOT took an action against him that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity; and (4) there is a causal connection between the protected activity and the adverse action -- that is, a retaliatory motive played a part

in the adverse action. *See Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

If such evidence is presented, the burden shifts to the defendant to demonstrate a "legitimate, nondiscriminatory reason" for the challenged adverse action. *See McDonnell Douglas*, 411 U.S. at 802; *Jute*, 420 F.3d at 173. If the defendant articulates such a reason, the burden shifts back to the plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see also Taitt* v. *Chem. Bank*, 849 F.2d 775, 777 (2d Cir. 1988) (applying *McDonnell Douglas* to retaliation claim).

1.     *General Principles*

As indicated above, the plaintiffs have alleged numerous incidents of retaliation. In response, defendants advance various bases for summary judgment. Thus, it seems appropriate to discuss generally the principles implicated by these arguments before applying them to each plaintiff's alleged incidents of retaliation.

a.     *The Materially Adverse Action Requirement Under* Burlington Northern

Defendants argue that many of plaintiffs' allegations are insufficient as a matter of law because they do not constitute actions sufficiently "materially adverse" to support a claim of retaliation. For example, defendants contend that allegations of hostile words, requests for certain medical documents, and letters of warning that did not result in any discipline are not adverse actions.

The Supreme Court established a new standard for evaluating adverse actions in Title VII retaliation cases in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53

(2006).  Explaining that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," the Court decided "the level of seriousness to which this harm must rise before it becomes actionable retaliation."  *Id*. at 67.  It rejected the prior standards that limited actionable retaliation to "so-called 'ultimate employment decisions,'" *id*., and adopted a broadened standard that requires a plaintiff to "show that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68 (internal quotation marks and citations omitted) (emphasis added).

The material adversity requirement is intended "to separate significant from trivial harms."  *Id*.  The Court noted that "normally petty slights, minor annoyances, and simple lack of good manners" will not suffice because they will not deter victims of discrimination from complaining to the EEOC.  *Id*.  In addition, the Court held that the provision's standard for judging harm must be objective and articulated the standard in general terms "because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id*. at 69 ("Context matters.").  The Court also noted that this standard does not require a reviewing court or jury to consider the nature of the underlying discrimination.  "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, … this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id*. at 69-70.

i.      *"Friendly" Warnings*

Plaintiffs' claims that some supervisors -- acting out of concern for plaintiffs -- "warned" them that members of management were closely scrutinizing them, or that other supervisors disagreed with the outcome of the arbitration and wanted them to be fired again, do not constitute materially adverse actions.  As an initial matter, on summary judgment, a court evaluating whether a plaintiff has satisfied its initial burden must "determine only whether proffered *admissible* evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173 (emphasis added).  Thus, allegations involving statements allegedly made by management or supervisors to other supervisors who communicated those opinions and "threats" to plaintiffs are dismissed because they are inadmissible hearsay.  *See Thomas v. iStar Fin., Inc*., 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006) (threats that plaintiff's job was in jeopardy made in the form of hearsay comments to third parties are not materially adverse actions); *see also Holloway v. Dep't of Veterans Affairs*, 309 F. App'x 816, 819 (5th Cir. 2009) ("when a supervisor makes a challenged comment not to the plaintiff-employee but to his co-workers, the comment's hearsay nature militates against a finding of materiality") (internal quotation marks and citation omitted).  Moreover, these statements are not materially adverse because they caused no harm, but rather were shared with plaintiffs out of concern for them.  Plainly, such comments are not retaliatory.

ii.      *Threats, Warnings, Close Scrutiny and Hostility*

Some courts in this circuit have held that unrealized threats of termination, warnings, close scrutiny, or hostility, do not meet the material adversity requirement.  *See Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (oral and written warnings applying employer's disciplinary policies to the employee were not materially adverse); *Byra-Grzegorczyk*

*v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 252 (D. Conn. 2008) (neither poor performance reviews nor requirement to attend weekly meetings reached the level of being materially adverse); *Sangan v. Yale Univ.*, No. 06CV00587, 2008 WL 350626, at *5 (D. Conn. Feb. 7, 2008) (being yelled at and criticized about work is not an adverse action); *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05 Civ. 8026, 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) ("Under [the *Burlington Northern*] standard, it is clear that [a supervisor's] alleged 'threat' that plaintiff's days at Reader's Digest are numbered did not constitute a materially adverse action. The alleged threat, assuming it happened, was never carried out."); *Scott v. Cellco P'ship*, No. 98 Civ. 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) (reconsidering previous order in light of *Burlington Northern* and declining to alter conclusion that plaintiff's assertions of "general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute adverse action). However, because the *Burlington Northern* standard requires consideration of an alleged retaliatory act in the context of the plaintiff's particular circumstances, threats may meet this threshold. *See, e.g.*, *Scott*, 2007 WL 1051687, at *2 (denying summary judgment on claim pertaining to threat of transfer to equivalent position in a different store location where three of the persons accused of prohibited conduct had also been transferred); *Thomas*, 438 F. Supp. 2d at 366 (noting that "[t]hreats could also potentially be a materially adverse action," but finding no materially adverse action where threats were either made indirectly to plaintiff or did not clearly imply that plaintiff would be fired). Because "not every action taken by an employer that is adverse to the employee is *materially* adverse," *Byra-Grzegorczyk*, 572 F. Supp. 2d at 252, the plaintiff must demonstrate that the harm suffered was more than mere inconvenience. Thus, because of the need to examine

the context and particulars of plaintiffs' assertions that they were threatened, closely scrutinized or treated with hostility, these claims are discussed individually below.

When doing so, it is useful to keep in mind that "Title VII, … does not set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* It is the task of courts to "'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Higgins v. Gonzalez*, 481 F.3d 578, 591 (8th Cir. 2007) (noting that plaintiff "cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs"); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109, 2007 WL 1149979, at *9 (S.D.N.Y. Apr. 18, 2007) (mockery, "nasty looks" and "angry silences" by other staff members are not adverse actions).

### iii. *Requests for Medical Documentation & Health Benefits*

Legitimate requests for medical documentation for sick leave are not "materially adverse" actions. Such requests would not dissuade a reasonable worker from engaging in protected activity. *See, e.g.*, *Wells v. Gates*, No. 08-1358, 2009 WL 1991212, at *4 (4th Cir. July 10, 2009) (per curiam) (unpublished) (agreeing with district court's finding that request for further medical documentation prior to granting request for additional medical leave was not a materially adverse action); *see also Byrne v. Telesector Res. Group, Inc.*, No. 04-CV-0076, 2007 WL 962929, at *15-16 (W.D.N.Y. Mar. 29, 2007), *aff'd*, No. 08-0101, 2009 WL 2019951 (2d Cir. July 14, 2009) (summary order) (request that employee whose mother was in the hospital

work during the weekend did not rise to the level of materially adverse action under *Burlington Northern*). Nor would temporary lapses in medical certification which are remedied in a matter of hours. *See Messer v. Bd. of Educ. of City of New York*, No. 01-CV-6129, 2007 WL 136027, at *18 (E.D.N.Y. Jan. 16, 2007) (where plaintiffs' health benefits were reinstated after they complained, "[b]ecause plaintiffs were not actually denied health care coverage during the relevant time period, they are unable to demonstrate that the … health benefit termination constituted a materially adverse employment action").

However, actual termination of health benefits and coverage can meet the *Burlington Northern* standard when such actions could induce an employee to refrain from participating in protected activity. Similarly, the denial of sick leave may meet the standard. *See, e.g., Wells*, 2009 WL 1991212, at *5 ("Based on the financial impact, we cannot say that a reasonable worker would not be dissuaded from engaging in protected conduct by the loss of … compensation from denial of sick leave.").

iv.     *Schedule Changes, Transfers and Reassignments*

Whether a schedule change or reassignment is materially adverse depends on the circumstances of the employee. *See Burlington Northern*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."); *see also Cruz v. Liberatore*, 582 F. Supp. 2d 508, 523-24 (S.D.N.Y. 2008) ("[W]ere [Plaintiff's] retaliation claim predicated solely on his change of schedule, he would face a difficult, if not Sisyphean, task. … [However,] a transfer that affects a parent's ability to spend time with and care for a child is the type of employment action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington Northern*, 538 U.S. at 57)); *Montgomery v.*

*Chertoff,* No. 03-CV-5387, 2007 WL 1233551, at *17-18 (E.D.N.Y. Apr. 25, 2007) (although her salary did not change, U.S. Customs Officer's allegations that she was restricted from using her weapon and was unable to work overtime as a result of her reassignment met the material adversity requirement under *Burlington Northern*, noting that "carrying a weapon goes to the heart of plaintiff's job responsibilities"); *Guerrero v. Lowe's Home Centers, Inc.*, 462 F. Supp. 2d 399, 410 (W.D.N.Y. 2006) (transfer materially adverse where plaintiff was required "to work shifts that were sometimes earlier and sometimes later than her previous schedule, as well as some weekends" and plaintiff was the mother of school-age children); *but see Sibilia v. Snow*, No. 05-10096, 2006 WL 2990479, at *7 (D. Mass. Oct. 20, 2006) (a *denial* of transfer which resulted in an increased commuting time was not materially adverse).

      b.      *The Causal Connection and The Need For Protected Activity That Precedes the Alleged Retaliation*

As part of their burden of making a prima facie case, plaintiffs must also show proof of a causal connection between the protected activity and the retaliation. This can be shown either (1) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)); or (2) indirectly, "by showing that the protected activity was closely followed in time by the adverse action." *Cifra*, 252 F.3d at 217 (internal quotation marks and citation omitted). The Second Circuit has not established a bright line rule for determining when retaliatory conduct is said to have "closely followed" a plaintiff's protected activity. *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). However, "a passage of two months between the protected activity and the adverse employment action seems to be the

dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03 CV 3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases).

Defendants correctly contend that some of plaintiffs' claims are barred because they are based on alleged acts that occurred prior to plaintiffs engaging in protected activity and thus fail to show a causal connection. "There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *see also Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) ("The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement.").

Plaintiffs' union grievances challenging their administrative leaves and terminations did not include allegations of discrimination. In fact, as addressed above, Osborne expressly denied the existence of any discrimination claims at the arbitration. *See* DOT's 56.1 Statement ¶ 31 & Ex. S at 539 ("MR. OSBORNE: That is not a position we have taken or are taking in this case, period."). It is well settled that union grievances that do not allege discrimination do not constitute protected activity within the meaning of Title VII. *See, e.g.*, *Clemente v. New York State Div. of Parole*, No. 01 Civ. 3945, 2004 WL 1900330, at *13 (S.D.N.Y. Aug. 24, 2004) (union grievances that fail to allege discrimination do not qualify as protected conduct under Title VII); *Marshall v. Nat'l Ass'n of Letter Carriers Br. 36*, Nos. 00 Civ. 3167 & 01 Civ. 3086, 2003 WL 223563, at *9 (S.D.N.Y. Feb. 03, 2003) (same). Thus, although EEO counseling is protected activity, *see, e.g.*, *McGuire v. U.S. Postal Service*, 749 F.

Supp. 1275, 1282 (S.D.N.Y. 1990), challenged actions that preceded a plaintiff's contact with an

EEO counselor are barred.

        c.     *The Need To Fully Exhaust Claims Brought under the Negotiated Grievance Procedure and Plaintiffs' Claim for Back Pay*

Pursuant to 29 C.F.R. 1614.301(a) and 5 U.S.C. § 7121(d), claims that are

brought as grievances under a collective bargaining agreement and are unexhausted cannot form

the basis of a retaliation claim. *See Fernandez*, 471 F.3d at 54 ("Before bringing a Title VII

action in the district court, an aggrieved employee is required to exhaust his administrative

remedies."). Here, some plaintiffs filed grievances that pertain to the same allegations they

brought in this case, which remain unexhausted. Plaintiffs contend that "the special

circumstances" of this case should allow them to bring their claims in this forum despite their

failure to meet the exhaustion requirement. Pls.' Br. at 24. They argue that any failure to

exhaust claims brought via the negotiated grievance procedure should be excused because the

defendants have rejected every grievance filed by NATCA members since September 2006 and

thus, they contend, it will be impossible to exhaust these grievances.

Plaintiffs explain that in September 2006, the defendants suspended the 2003

CBA and "unilaterally imposed work rules upon the NATCA membership." Pls.' Br. at 25; *see*

Barbarello Aff. ¶¶ 7-8 (submitted with plaintiffs' memorandum in opposition to the instant

motion). As a result, NATCA files all of its grievances under the former 2003 collective

bargaining agreement, which defendants refuse to recognize. *Id.* ¶ 10. Consequently, plaintiffs

claim, defendants have found every grievance filed under the 2003 CBA to be "procedurally

defective." *Id.* ¶¶ 9-10. According to NATCA Vice-President Phil Barbarello, there are

approximately 400,000 grievances presently pending nationwide and no arbitrations are currently

taking place. *Id.* ¶¶ 11-14. Plaintiffs argue that as a result, they are precluded from exhausting the union grievance procedure.

Plaintiffs cite to *Fernandez* in support of their position. In that case, the Second Circuit addressed what avenue of relief was available to a plaintiff whose grievance was abandoned by his union after the plaintiff unilaterally withdrew from arbitration, which occurred after he had rejected a proposed settlement that his union viewed to be reasonable. The Circuit rejected the government's argument that the plaintiff was precluded from bringing his action based on his filing of a grievance on the same issue and remanded the case to this Court to consider whether his failure to exhaust EEOC remedies could be excused. In so doing, the Circuit instructed this Court to consider whether Fernandez's failure to exhaust administrative remedies under the agreement was attributable to his union's actions in preventing a "final decision" from which he could have otherwise appealed. *Fernandez*, 471 F.3d at 57-58.

I need not reach the question whether plaintiffs' failure to exhaust the union grievance procedure should be excused. Some plaintiffs' claims pertain to grievances that were filed and denied months before the September 2006 suspension of the 2003 CBA. Because the complained of "special circumstances" did not exist at that time and thus could not have prevented or discouraged plaintiffs from appealing the denials, their failure to exhaust the administrative process with respect to those claims precludes my consideration of them here. With respect to those grievances that were filed after September 2006, those claims are nevertheless denied for the reasons discussed below.

d.    *The Issue of Back Pay*

Plaintiffs allege that the defendants retaliated against them by not paying them the full amount they believed they were owed under the Stipulated Award from the period between

their termination and their reinstatement (October 2005 to December 12, 2005). On January 13, 2006, NATCA filed a grievance pursuant to Section 11 of the CBA on behalf of plaintiffs against FAA, seeking compliance with the back pay award. DOT's 56.1 Statement, Ex. CC. That grievance was denied on February 3, 2006. *Id*., Ex. DD. Under Section 11 of the CBA, grievances filed by the Union are subject to a three-step process. First, a grievance must be filed, to which a written response is due within 20 days. Second, if the moving party is not satisfied with the answer, it may refer the matter to the respondent at the regional level within 20 days of receiving the answer. The responding party must answer within 20 days. If the moving party desires the matter to be submitted to arbitration, it must advise the respondent at the national level by certified mail within 30 days. The third and final step is an arbitrated grievance hearing. *Id*., Ex. O, at 25-26.

The determination denying the back pay grievance was not exhausted because NATCA did not refer the matter to the regional level or seek arbitration. Plaintiffs' contention that "special circumstances" should excuse their failure to exhaust is meritless. Pls.' Br. at 24. Plaintiffs' grievance pertaining to the back pay award was denied on February 2, 2006, more than six months before the Agency suspended the 2003 CBA, allegedly making it "impossible" for the plaintiffs to exhaust the grievance procedures. *Id*. at 25. Had plaintiffs appealed the decision or sought arbitration, their argument may have merited additional consideration. However, under the undisputed facts, plaintiffs cannot revive their back pay claim by bringing it as a retaliation claim under Title VII.

In addition, the back pay claim fails because of the causation requirement. NATCA filed the back pay grievance on behalf of plaintiffs on January 13, 2006. Thus, the defendants were allegedly noncompliant with the terms of the back pay award prior to that date.

But none of the plaintiffs engaged in protected activity until -- at the earliest -- January 19, 2006, when Kaplun, Landi and Smith first contacted EEO counselors.  Therefore, notwithstanding the plaintiffs' failure to exhaust the negotiated grievance procedure, the back pay claim raised in the grievance cannot be retaliatory because it preceded any protected activity.

2.    *The Plaintiffs' Individual Retaliation Claims*

a.    *John Landi*

Defendants are entitled to summary judgment with respect to all of Landi's claims for the following reasons.

Landi's claim (1), that he "overheard FAA management stating that 'the reinstated air traffic controllers must have done something wrong or else [they] would not have been fired,'"  Landi Aff. ¶ 14, does not meet the material adversity requirement.  At most, such a statement -- which was not even directed at Landi -- falls within the category of non-actionable behavior characterized by "petty slights" and "bad manners," rather than that which would cause someone to refrain from engaging in protected activity.  DOT's 56.1 Statement, Ex. BB ("Landi Dep."), at 89-90.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Landi's claim (2) pertaining to back pay.

With respect to Landi's claim (3) -- that his health insurance lapsed in April 2006 -- the defendants do not contend that cutting off health insurance can never qualify as a materially adverse action.  Rather, they provide a non-discriminatory reason for the "lapse" that occurred during the period from December 2005 to April 2006, which plaintiffs have not rebutted.  When plaintiffs were terminated, they enrolled in COBRA because they were no longer eligible for health insurance as FAA employees.  After reinstatement, they were

reimbursed for COBRA expenses and reenrolled in the FAA employee benefits plan.  However, the administrative process of reenrolling plaintiffs did not go smoothly due to a "disconnect" between the regional HR management office at JFK and the service center in Atlanta.  As a consequence, from December 2005 to April 2006, the reinstated air traffic controllers were not yet reenrolled with the FAA employment health insurance.  *Id.*, Ex. EE ("Grefe Dep."), at 50-52; Ex. FF ("Tracy Dep."), at 109-11.  The matter was resolved for all affected air traffic controllers around April 2006.  Notwithstanding the "lapse," neither Landi nor his family was denied medical care during the "lapse" period.  When coverage was reinstated, it was made retroactive; Landi never paid any additional costs beyond those required under the FAA employee insurance, and all of his bills were covered.  Landi Dep. at 91-96.  The gist of Landi's complaint seems to be that it was inconvenient to have to bring bills to the TRACON department, which handled the bills until he was reenrolled, and that the reenrollment process was unreasonably prolonged.  *Id.*

The defendants have therefore met their burden of articulating a legitimate, nondiscriminatory reason for the lapse.  Landi asserts in conclusory fashion he "suspect[ed] that someone didn't do their job as an act of reprisal."  *Id.* at 95.  This mere suspicion -- without more -- does not suffice to show that the explanation offered by the defendants is in fact a pretext for retaliation.  Moreover, the undisputed facts show that Landi did not suffer a significant harm as a result of this lapse in coverage.  Therefore, his claim also fails on the facts of this case for the additional reason there was no materially adverse action.  Accordingly, summary judgment is granted with respect to Landi's claim (3).

Landi first contacted an EEO counselor on January 19, 2006.  Because claims (4) and (6) relate to alleged acts (retraining "every second of every day") preceding that date (Landi

testified that the training was completed "after a month or so", *id*. at 58), defendants are entitled to summary judgment on these claims.[13]

Landi's claim (5) does not allege retaliatory conduct. This claim alleges that in October 2006, William Allen, a supervisor with whom Landi had a good relationship, told him "you should retire as soon as you are eligible -- it's the best thing for you." *Id.* at 102-03. Landi testified that Allen told him this because "[h]e believed it would be in my best interest, cause me less aggravation." *Id*. at 103. This claim does not involve adverse action at all -- let alone a materially adverse one. Accordingly, it does not survive summary judgment.

### b.   *Christopher Piccola*

Summary judgment is granted for defendants with respect to both of Piccola's claims. For the reasons discussed above, defendants are entitled to summary judgment with respect to Piccola's claim (1), which pertains to back pay.

Piccola's other claim, raised for the first time in his IR, alleges that his request for a week off with pay in March 2006 was denied.[14] Piccola testified that Terry Tracy denied the request because the doctor's note was insufficient. Piccola's doctor then refused to write a different note because he believed the first one was sufficient. As discussed above, legitimate requests for medical documentation are not materially adverse actions. And even if they were,

---

[13]     Moreover, Landi has not demonstrated that the additional training amounted to an adverse action. At his deposition, Landi testified that he did not have to "recertify" (demonstrate proficiency in air traffic control and be approved after monitoring by a supervisor), but rather had to become current when he was reinstated (work a certain number of hours in a certain time period in order to work under general supervision). Landi Dep. at 53-58. He agreed that because of the time between the administrative leave and the reinstatement, none of the 11 controllers were current at the time they were reinstated. *Id*. at 53. Thus, they were required to become current. He also explained that after becoming current he was required to do a training program based on an error he made the previous March. Finally, Landi stated that he believed the intensity of retraining was in retaliation for getting his job back, *i.e*., for successfully grieving his termination. *Id*. at 55. Title VII prohibits retaliation for engaging in protected activity. However, as discussed above, filing a grievance that does not allege discrimination is not protected activity under Title VII. Thus, any animus shown towards the reinstated controllers because they prevailed in their grievances is not actionable under Title VII.

[14]     At his deposition, Piccola indicated that he had in fact requested a week without pay in late February or March of 2006. Piccola Dep. at 54-55.

Piccola has not offered any admissible evidence that Tracy's request for a doctor's note was a pretext for impermissible retaliation. Accordingly, this claim fails as well.

        c.     *Kent Mitchell*

Defendants are entitled to summary judgment with respect to all of Mitchell's claims.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Mitchell's claim (1), which pertains to back pay.

Mitchell's remaining claims are based on actions that were not materially adverse. Mitchell claims that his failure to receive a timely response to his request for an estimate of his retirement benefits was a retaliatory act (claim (2)). Mitchell, who testified that this "may" have delayed his retirement by a few months, DOT's 56.1 Statement, Ex. GG ("Mitchell Dep.") at 75-76, has not shown that he suffered any "injury or harm" as a result of this failure. *Burlington Northern*, 548 U.S. at 67.[15] Claims (5) and (6) pertain to comments he overheard to the effect that plaintiffs should not have been reinstated. These claims are not materially adverse for the reasons discussed above regarding Landi's claim (1). Nor are Mitchell's claims that his "veracity and … work experience" were questioned by his supervisors after reinstatement (claim (3)) or that he was told to "watch [his] ass" and that the reinstated controllers were being watched (claim (4)), so adverse that they would dissuade a reasonable employee from engaging in protected activity. While such questioning and scrutiny may have been unpleasant, these statements did not cause Mitchell to suffer any significant harm. *See, e.g.*, *Scott v. Cellco P'ship*, No. 98 CIV 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ("general reprimands about

---

[15]     Mitchell testified that he had a difficult time contacting representatives at the Washington D.C. office, which was responsible for handling his request regarding retirement benefits. He "assumed" these people knew him or of him because they were in the "management chain" and discriminated against him "[u]nder the direction of the FAA management." Mitchell Dep. at 76. No genuine issue of material fact exists with respect to this claim because this speculative evidence is not sufficient for a reasonable jury to return a verdict for Mitchell.

plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute materially adverse actions). Similarly, because "the significance of any given act of retaliation will often depend upon *the particular* circumstances" *Burlington Northern*, 548 U.S. at 69 (emphasis added), a denied request for a schedule change (claim (8)) and being assigned to work on a holiday on two occasions (claim (7)),[16] without more detail, do not satisfy the material adversity requirement. *See id*. at 69 (noting that "[a] schedule change … may make little difference to many workers, but may matter enormously to a young mother with school age children").

        d.    *David Mangene*

        Defendants are entitled to summary judgment with respect to all of Mangene's claims.

        For the reasons discussed above, defendants are entitled to summary judgment with respect to Mangene's claim (1), which pertains to back pay. Mangene first contacted an EEO counselor on February 23, 2006. Mangene's claims (5) and (7) relate to alleged acts that preceded that date. Therefore, defendants are entitled to summary judgment on these claims, because the challenged conduct cannot have been in retaliation for Mangene's protected activity. Defendants are entitled to summary judgment with respect to Mangene's claim (6) -- that his health insurance was "wrongfully" terminated -- for the reasons discussed above with respect to Landi's claim (3).[17]

---

[16]    In addition, Mitchell has not demonstrated that his claim (7) is causally connected to his participation in protected activity. Although causal connection can be shown circumstantially based on the temporal proximity of the discriminatory treatment to the protected activity, Mitchell has failed to allege the dates of the holidays he was required to work. He has also failed to demonstrate causal connection directly, through evidence of "retaliatory animus" directed at him by defendants. Without more than the bare allegation itself, Mitchell has failed to make a prima facie retaliation claim based on these events.

[17]    Moreover, like Landi, Mangene did not suffer any harm as a result of the lapse in coverage. Mangene took his daughter to the doctor twice in April 2006, and discovered that his FAA employee insurance had

Mangene's claim (2), which appears only in Mangene's EEOC complaint, alleges that he was improperly denied leave and improperly questioned about the reasons for the leave request, in violation of the Collective Bargaining Agreement. This claim does not appear again in the IR or his affidavit. However, claim (8) appears in both, and alleges that Mangene was counseled for sick leave abuse in January/February 2006. In the absence of additional detail regarding claim (2), I conclude that Mangene has not made a prima facie case regarding this claim because the complained-of action is not materially adverse. To the extent that claim (8) is a more detailed explanation of claim (2), it too fails under the same rationale. In his deposition, Mangene testified that in late January-early February 2006 he received a warning letter regarding his use of sick leave. However, he was not denied the time off nor was pay deducted for the days he allegedly abused the sick leave policy. Mangene Dep. at 53-54. As discussed above, although the denial of sick leave may be a materially adverse action in some circumstances, *see, e.g.*, *Wells v. Gates*, No. 08-1358, 2009 WL 1991212, at *4 (4th Cir. Jul 10, 2009) ("Based on the financial impact, we cannot say that a reasonable worker would not be dissuaded from engaging in protected conduct by the loss of this compensation from denial of sick leave."), receipt of a letter of warning alone is not. Even accepting as true Mangene's speculative belief that this letter was issued to enable "progressive discipline" in the future, Mangene Dep. at 53, this action cannot be characterized as one that would cause a reasonable employee to refrain from participating in protected activity because general reprimands and excessive scrutiny, without more, are not sufficiently materially adverse to be actionable. *See Scott v. Cellco P'ship*, No. 98 CIV 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ("general reprimands about

---

not been reinstated. About a week after speaking to Tracy, "it was fixed." DOT's 56.1 Statement, Ex. HH "Mangene Dep.", at 65-66.

plaintiff's lateness and other accusations, and alleged excessive scrutiny" do not constitute adverse action).

Mangene's claim that his supervisor, Kevin Watson, warned him "to watch out" because management "hates" him, fails for the same reasons that Landi's claim (5) fails: it does not allege an adverse action, nor is it action attributable to defendants. Mangene testified that he believed Watson, with whom he was on good terms, warned him about how management felt because he "was looking out" for him. Mangene Dep. at 57. Thus, Watson's comments are in no way retaliatory.

In claim (4), Mangene contends that he was retaliated against when Enzio Powell, another supervisor, followed him in the parking lot on numerous occasions and sat behind Mangene while he was in "position," directing air traffic. More specifically, Mangene claims that Powell "physically intimidated" him by walking closely behind him and by following him into the facility in his car and almost hitting him with his car. Mangene Aff. ¶ 12. Mangene believed that Powell wanted to provoke him to have a "verbal or physical reaction" so that he would get fired again. Mangene Dep. at 62. Mangene explained that Powell did not like him and "was a very power-hungry man and I felt that if he could get me to do something, that it would look good in management's eyes." *Id.* With respect to the allegations that Powell sat directly behind him and monitored him while he was directing air traffic, Mangene stated that this occurred approximately seven times during a six-week period and ceased after he complained about it. *Id.* at 63-64. This claim fails because Mangene has not demonstrated that defendants had any role in Powell's behavior. Because Mangene alleges Powell intimidated him in these ways because he didn't like him and wanted to get in the good graces of the

management, Mangene has not shown that Powell's behavior was in any way motivated by a desire to retaliate against Mangene for having engaged in protected activity.

       e.     *Thomas Fitzgerald*

Defendants are entitled to summary judgment with respect to all of Fitzgerald's claims for the following reasons.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Fitzgerald's claim (1), which pertains to back pay. Fitzgerald's claims (2), (4), (9) and (10) relate to alleged acts that preceded Fitzgerald's first contact with an EEO counselor on February 6, 2006. These claims fail because they challenge employer actions that predated Fitzgerald's protected activity. Like claim (5), claims (3), (9) and (10) also fail to make a prima facie case of retaliation because they are based on inadmissible hearsay. In addition, claim (10) -- that management considered the arbitration a "huge victory" -- is plainly not retaliatory conduct, but rather is merely an unactionable opinion. Claim (5), which alleges that Fitzgerald's co-workers were warned not to cover for him, also fails because it there is no evidence that Fitzgerald suffered any adverse action (*i.e.*, that the co-workers followed this instruction); *see also Higgins v. Gonzalez*, 481 F.3d 578, 591 (8th Cir. 2007) (plaintiff "cannot make [his] claim based on personality conflicts, bad manners, or petty slights and snubs"). That Fitzgerald was questioned about the need to take sick leave (claim (7)) may have been "out of the norm," as Fitzgerald claims, but is not a materially adverse action, especially in light of the fact that his request for leave was not denied. DOT's 56.1 Statement, Ex. II ("Fitzgerald Dep."), at 136-37.

In claim (6), Fitzgerald claims that a March 2006 request to move from a night shift to a day shift for one day was denied first by Jim Giotta, a supervisor, and then by his immediate supervisor, Keith McDonald, who told him he was instructed "to deny any requests

from you guys." IR at 14. Fitzgerald then sought the assistance of the area manager, Doug Alter, who approved his request. The denial of his request for a one-day shift-change is not a materially adverse action; at most it is a "trivial harm" or "mere inconvenience." Moreover, that the matter was resolved three hours later militates even more strongly against a finding of *any* harm, let alone a "significant" one. Fitzgerald Dep. at 128-29.

Fitzgerald also claims that he was retaliated against when he received a letter from Clarke in June 2006, when he was a participant in the leave donation program, "threaten[ing] removal" unless he returned to work or provided medical documentation to the flight surgeon verifying his need to be on extended sick leave. Fitzgerald's wife had already delivered copies of the required paperwork to the Flight Surgeon; however, those documents were either lost or never received by the proper party. Fitzgerald's wife re-submitted the documents, which resolved the matter. Fitzgerald Dep. at 138-41. As noted above, a request for medical documentation is not a materially adverse action. Accordingly, this claim, (8), also fails. *See, e.g.*, *Wells v. Gates*, No. 08-1358, 2009 WL 1991212, at *4 (4th Cir. Jul. 10, 2009) (agreeing with district court's finding that request for further medical documentation prior to granting request for additional medical leave was not a materially adverse action).

f. *Kevin Delaney*

Defendants are entitled to summary judgment with respect to all of Delaney's claims for the following reasons.

Delaney first contacted an EEO counselor on January 20, 2006. Delaney's claims (1), (2), (3), (4) and (7) relate to alleged acts that preceded the protected activity. Accordingly, these claims fail.

Delaney's claim of retaliatory constructive discharge (claim (6)) also lacks merit. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); *accord Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004). The doctrine of *res judicata*[18] bars Delaney's constructive discharge claim because the Merit Systems Protection Board, *Delaney v. Dep't of Transp.*, NY-0752-07-0128-1-1, affirmed the administrative law judge's decision that Delaney failed to prove a constructive discharge, which was affirmed by the Federal Circuit on appeal. *Delaney v. Dep't of Transp.*, 319 F. App'x 905 (Fed. Cir. 2009). In addition, Delaney submitted his written resignation on January 3, 2006, over two weeks before he contacted an EEO counselor. Therefore, even assuming *arguendo* that the work atmosphere was intolerable, there is no causal connection between it and Delaney engaging in protected activity.

Delaney's claim (5) alleges that he was retaliated against when the Department of the Interior sent him incorrect collection notices claiming that he was overpaid thousands of dollars in salary (and demanding refunds) because of the way his time was miscategorized. However, Delaney has not demonstrated that he suffered any adverse action. Delaney never made any payments and after he complained (by both contesting the notices in writing and amending his EEO complaint), he ceased receiving the letters. DOT's 56.1 Statement, Ex. JJ ("Delaney Dep."), at 163-65.

Finally, Delaney's claim (8) is that he was retaliated against when he received a bill "which was evidently meant" for a different individual with the same name who was also a

---

[18] The doctrine of *res judicata* "bars later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal citations and quotation marks omitted).

DOT employee. Receipt of a misdirected bill is not a materially adverse action. Nor can Delaney satisfy the causal connection requirement with respect to this claim.

g.    *John Kaplun*

Defendants are entitled to summary judgment with respect to all of Kaplun's claims for the following reasons.

Kaplun first contacted an EEO counselor on January 19, 2006.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Kaplun's claim (1), which pertains to back pay and leave under the Stipulated Award. His claim (2) regarding schedule changes "made for no reason, against the contract" fails because Kaplun was unable to provide any evidence that they occurred (he testified that he had no recollection what schedule changes he was referring to in his EEO complaint nor could he recall when they occurred, for how long or who changed his schedule). DOT's 56.1 Statement, Ex. KK ("Kaplun Dep."), at 41-42. Conclusory allegations by a plaintiff are insufficient to make a prima facie case on a summary judgment motion. Moreover, as discussed above, schedule changes, without more context as to the harm they caused, are not materially adverse actions.

Kaplun's claims (3), that he was singled out for retraining without reason, and (4), that he had retraining administered against FAA's own orders," DOT's 56.1 Statement ¶ 67 & Exs. U3, LL, were raised in a grievance dated March 29, 2006. That grievance was denied on April 21, 2006. *Id.*, Ex. LL (April 11, 2006 denial of Kaplun's grievance) (noting that "it was management's determination that in lieu of individual retraining plans … the Training Department would develop an overall plan for the recertification of all eleven rehired controllers."). Kaplun did not appeal this denial. His claim (5), that he was wrongfully written up in February 2006 for an operational error which occurred in January 2005, was raised in an

informal grievance dated March 21, 2006 and a formal grievance dated April 27, 2006.  *Id*., Ex. MM.  It was denied on June 8, 2006 and not appealed to the next step.  *Id*.  Kaplun's failure to exhaust these grievances precludes my review of the related claims here.

Kaplun's claim (6) is that he was denied instructions for completing the application for medical certification in December 2006.  This claim was raised in a grievance dated Dec. 12, 2006.  *Id*., Ex. NN.  Although the grievance was found to be procedurally and/or jurisdictionally defective because it relied on the 2003 CBA, on March 2, 2007 Clarke found that Kaplun's claim was legitimate and agreed to settle the grievance by forwarding Kaplun the instructions he requested and giving him duty time to review them and prepare a request for any necessary corrections or amendments.  *Id*.  This claim fails because Kaplun has not demonstrated that he suffered any significant harm as a result of the alleged denial, which was ultimately resolved in his favor.

Kaplun's claim (8) is that his supervisors gave him advice such as "keep [your] head low" because they did not "want to see [him] get fired or in trouble," Kaplun Dep. at 55-56, and it fails for the reasons previously discussed: Kaplun suffered no adverse action, whether material or not, by defendants.  Nor does his claim (9) pertain to an adverse action.  Kaplun alleged in the IR that he was "harassed" when he took a day of FMLA leave in November 2006 for the death of his father-in-law.  At his deposition Kaplun testified that his FMLA day had been approved, but his supervisor requested written proof from his father-in-law's doctor.  Even though Kaplun refused to comply with this request, approval for his FMLA leave was not withdrawn nor was he subjected to any other consequences.  Kaplun Dep. at 57-58.

It was not a materially adverse action for Kaplun to receive a sick leave restriction letter, requiring him to provide a doctor's note for each use of sick leave (claim (10)).  None of

the sick leave Kaplun requested was denied and the letter was withdrawn without any consequence. Kaplun Dep. at 53-55. His claim (7), that he was wrongfully denied FMLA leave in March/April 2007, fails because Kaplun has not shown that he suffered any significant harm or injury as a result of the denial. Finally, Kaplun's claim that his health insurance was cancelled in the spring of 2006 is denied for the reasons explained in above. *See supra* discussion regarding Landi's claim (3).

      h.    *John Smith*

Defendants are entitled to summary judgment with respect to all of Smith's claims for the following reasons.

Smith first contacted an EEO counselor on January 19, 2006.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Smith's claim pertaining to back pay (claim (4)). Smith's claims (1), (2), (3), (6) and (7), which involve comments overheard by Smith expressing the opinion that the terminated controllers should not have been reinstated and managements' failure to respond when Smith complained about the comments, fail because they do not allege materially adverse acts. These claims, like Landi's claim (1) and Mitchell's claims (5) & (6), fall within the range of "trivial harms" or "bad manners," but they are not of the quality that would preclude someone from engaging in protected activity. Because "Title VII, … does not set forth a general civility code for the American workplace," *Burlington Northern*, 548 U.S. at 68, it cannot be invoked as a mechanism to regulate personality conflicts.

Smith's claim (5) is that he was precluded from meeting with an EEO counselor in January or February 2006. Smith has not shown that this adverse action was causally related to his engaging in protected activity. There is no evidence in the record that his requests for

permission to meet with an EEO counselor were denied prior to his initial contact with one. To the extent Smith argues that his requests were denied based on his reinstatement or general dislike for him, his claim fails because it does not pertain to his protected activity. However, even assuming that Smith were able to make his prima facie case of retaliation, here the defendants have offered a non-discriminatory reason -- staff shortages -- for denying Smith's request to leave during work hours. Smith has no evidence from which a jury could infer that this reason was a pretext, and that the real reason was to retaliate against him.

Like Landi's claim (3) and Mangene's claim (6), Smith's claim (8) is that his health insurance lapsed in the spring of 2006. And like Landi and Mangene, Smith cannot show that he suffered any harm from that lapse aside from a minimal amount of disruption. DOT's 56.1 Statement, Ex. PP ("Smith Dep."), at 52-53. He "never paid anything out-of-pocket" to the doctors, and insurance covered all of the claims that he made. Moreover, as discussed with respect to Landi, defendants have offered a non-discriminatory basis for the lapse, which has not been rebutted.

Smith's claim (9) is that Clarke asked him in a "derogatory" and "intimidating" manner, "How are you doing now?"; (10) is that a supervisor told him he was told to "watch" the reinstated controllers;[19] (11) is that a supervisor announced that Smith was contagious and not allowed to work when he called in with questions about whether he could work on the medication he was taking; (12) is that his name was not on the "Read and Initial" list after he was reinstated; (13) alleges that his name was not placed back on his mailbox when he was reinstated; and (15) is that his request for a special chair was denied. They all fail because they do not allege materially adverse actions. At most these incidents amount to inconveniences and verbal slights; they do not present cognizable Title VII retaliation claims.

---

[19]    This claim is also inadmissible hearsay and thus fails for that additional reason.

Smith's claim (14) pertains to his TSP loan. He claims that when he was reinstated, money was not automatically withheld from his paycheck to pay this loan and that he had to make payments manually. Smith does not know whether the failure to be enrolled in automatic payroll deductions is attributable to the FAA or the TSP offices. Defendants have established that TSP loans are not handled by TRACON but by out-of-state offices. In any event, regardless of which office is at fault, Smith has not presented evidence that he suffered an adverse action as a result of needing to mail in the checks manually.[20]

    i.    *Robert Serviss*

Defendants are entitled to summary judgment with respect to all of Serviss's claims for the following reasons.

For the reasons discussed above, defendants are entitled to summary judgment with respect to Serviss's claim (4), which pertains to back pay under the Stipulated Award. Serviss first contacted an EEO counselor on January 20, 2006. Serviss's claims (1) and (2) relate to alleged acts that preceded the protected activity. Accordingly, these claims fail. They also fail because they were not exhausted as part of the grievance procedures in which they were unsuccessfully raised in January and February of 2006. *See* DOT's 56.1 Statement, Exs. QQ, RR. Similarly, claim (3), pertaining to the rejection of three of Serviss's training reports, was raised in a grievance via the negotiated procedure in February 2006 and was not exhausted after it was denied in March 2006. *See* DOT's 56.1 Statement, Ex. SS. Finally, claim (6), regarding an oral agreement between defendants and NACTA for prime time leave for the reinstated

---

[20]    In the IR, Smith alleges that he was "told he had to pay back the entire loan by December 29, 2006. Thus, he was forced to take out a home equity loan to pay off the [TSP] loan, and as a result his interest rate was higher." IR at 9. However, Smith provides no details as to who required him to pay back the loan or why. Such conclusory allegations that this conduct was retaliatory, wholly lacking in supporting admissible evidence, do not survive summary judgment.

controllers, was raised in a grievance in January 2006 and was never exhausted after it was denied March 6, 2006. *Id.*, Ex. WW.

Serviss's claim (5) is that in mid-January 2006, Clarke sought an ethics violation against him for "activity outside his employment" based on his appearance in a movie about 9/11. The claim fails for three reasons. First, the allegedly retaliatory letter from Clarke was dated January 18, 2006, and thus cannot be retaliatory because it preceded Serviss's first EEO contact on January 20, 2006. Second, this letter is not a materially adverse action. Contrary to Serviss's assertion that he "took this letter as a grave threat," Serviss Aff. at 4, the letter makes no threats or warnings. Rather, it explains that "there are certain restrictions" related to employees engaging in "outside activities that are compatible with their Government duties" and requests additional information, such as whether he was paid, how he came to participate, what his role in the film was and whether he provided information to the film producers about either what it is like to be an air traffic controller, or the actual events on 9/11. *Id.*, Ex. TT. Serviss submitted his response on January 27, 2006, *id.*, Ex. UU, to which he never received any follow-up communication or reprimand. Such a letter cannot be construed as an action that would dissuade a reasonable employee from engaging in protected activity because Serviss suffered no significant harm as a result of receiving the letter. Third, Clarke had a legitimate, non-discriminatory reason for issuing the letter: government employees may be subject to certain restrictions related to outside employment. Given the circumstances, it was entirely appropriate for Clarke to inquire into Serviss's participation in the film, and Serviss has not met his burden of showing that the proffered reason was pretextual.

The lack of response to Serviss's request for a transfer to a busier sector in the building (claim 9)) fails because it is not a materially adverse action. Aside from stating that the

other sector would be busier and more challenging, Serviss has not demonstrated that there would be any meaningful change in his working conditions. DOT's 56.1 Statement, Ex. VV ("Serviss Dep."), at 66. Moreover, given the length of time between the alleged adverse action and Serviss's participation in protected activity, he has failed to adduce evidence of a causal connection. *See Cunningham v. Consol. Edison, Inc.*, No. 03 Civ. 3522, 2006 WL 842914, at *19 (E.D.N.Y. March 28, 2006) ("a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"). Similarly, in connection with his claim (8), which alleges that he was called on three occasions in June and July 2007 to work overtime during a period in which he would have worked seven consecutive days, Serviss fails to demonstrate that he suffered any cognizable harm. There is no evidence in the record that Serviss was forced to work the extra shifts or penalized in any way. Rather, in his grievance, Serviss noted that these actions "created a nuisance" to him and his family. As previously stated, mere inconveniences do not fall within the range of harms that Title VII's anti-retaliation provision protects against.

Serviss's claim (7) is that he was forced to take sick leave on March 28, 2007 because the FAA claimed to have no other "facility duties." It was the subject of a grievance filed after September 2006, which was denied in July 2007 as (a) untimely, (b) in accordance with applicable rules, and (c) procedurally and/or jurisdictionally defective because it relied on the September 2003 contract. *See* DOT's 56.1 Statement, Ex. XX. As a remedy, Serviss sought restoration of leave used on that date and restoration of any lost wages. *Id.* He asserts that the reason given by the defendants "was pretextual, in that overtime was used by other controllers on that day even thought it was my regular day to work." Serviss Aff. at 4. However, in his deposition, Serviss testified that he was disqualified to work the radar positions on that shift due

to medication he was taking and that his request to be posted to flight duty was denied. Serviss Dep. at 67-68. The inference to be drawn from the record is that Serviss was forced to take sick leave because he could not work his usual post and his request to work other duties was denied. Although this claim is a closer call than other claims brought herein because Serviss asserts that he was prevented from working, and thus lost sick time, Serviss has not sufficiently demonstrated that he suffered significant harm as a result of defendants' alleged actions.

       j. *Peter Wong*

Defendants are entitled to summary judgment with respect to all of Wong's claims for the following reasons.

Wong first contacted an EEO counselor on January 24, 2006. Wong's claims (4), (5), (6), (7), (8), (9) and (10)[21] fail because they challenge acts that preceded the protected activity. For the reasons discussed above, defendants are entitled to summary judgment with respect to Wong's claims (1) and (3), which pertain to the calculation of back pay under the Stipulated Award.

Claim (2) is that Wong's health insurance was cancelled in April 2006. This claim fails for the same reasons discussed above; like some of the other reinstated controllers, when Wong was reinstated he was not properly reenrolled in his health insurance. However, the coverage was made retroactive after he informed HR that it had lapsed and all of his expenses were paid. Although the denial of health coverage could in some contexts be a materially adverse action, here Wong suffered no "significant" harm because the problem was resolved "a couple of weeks" after he discovered the problem. DOT's 56.1 Statement, Ex. ZZ ("Wong

---

[21]      Although denial of shift changes could amount to an adverse action, *see Burlington Northern*, 538 U.S. at 69, Wong has not demonstrated sufficient facts to show that this denial caused him "significant" harm.

Dep."), at 73.  Moreover, evidence of any retaliatory motive is lacking because defendants have offered a non-discriminatory reason for the lapse that Wong has not rebutted.

Similarly, Wong has not shown that he suffered an adverse action when he was notified that he had lost his medical clearance in November 2008 (claim (19)).  Wong lost his medical certification because he had not submitted a required medical form.  After speaking with the Flight Surgeon, the matter was resolved.  Wong was reinstated the same day, a mere three hours after the initial call.  Wong Dep. at 115-19.  That Wong needed to make phone calls to resolve the situation, which caused him some "unnecessary stress," does not elevate this inconvenience to an actionable retaliation claim.

Wong's claim (12) that he was "wrongfully" counseled regarding sick leave abuse is not a materially adverse action.[22]  Nor was it a retaliatory act for defendants to deny his requests for shift changes and/or swaps (claim (9)) because such denials were not materially adverse actions.  The denials of Wong's request for leave in the summer, in September and in October of 2006 (claim (13)); to wear sneakers after knee surgery (claim (14)); and to cancel one day of annual leave in November 2006 (claim (15)) were also not materially adverse actions.  Without additional detail giving context to these events, Wong has failed to show that these claims can be characterized as more than "trivial harms."  None is an action that would dissuade a reasonable employee from participating in protected activity.  In addition, these three claims fail because Wong unsuccessfully grieved each of these denials and failed to appeal the decisions.  Wong also claims that defendants failed to reinstate his TSP contribution until approximately four months after his reinstatement (claim (11)).  Wong fails to show that he suffered any significant harm as a result of the delay in reinstating him into the automatic payroll deduction program.

---

[22]    Moreover, Wong grieved the counseling and the session was rescinded.  Wong Dep. at 76.

Wong claims that defendants retaliated against him by denying him overtime in January 2008. Overtime was offered based on a list showing the number of hours a controller had worked during the relevant period. When the opportunity to work overtime became available, a controller received a phone call based on his placement on the list. Wong testified that he often missed these opportunities because the call was made to his cell phone, which was shut off, rather than his home phone. Wong believed that defendants were required to call both phone numbers; however, he learned from his supervisor that they were required to call only one. Wong Dep. at 96-98. Wong was denied overtime three times: twice because the call was made to one number rather than two, and once because his overtime, which had been scheduled in advance, ultimately fell in a period in which he would have ended up working seven consecutive days, which is prohibited. Wong Dep. at 101-02. Wong has failed to demonstrate that he suffered any retaliatory act with respect to these undisputed facts. Thus claim (16) fails.

Wong did not suffer an adverse action (claim (20)) when his scheduled overtime was cancelled in July 2008 due to an operational error that occurred while training a developmental controller. After the operational error incident a supervisor, Hillary King, informed Wong's union representative that Wong would not be decertified and that he would work the overtime. However, when Wong arrived to work the scheduled day of overtime, he learned that he had in fact been decertified due to the error and consequently he lost the overtime. Wong testified that management was correct in charging him with an operational error and that as a result he was correctly decertified and unable to work overtime. Wong Dep. at 121-25. The crux of his claim appears to be that King misled him in thinking that he would be able to work the overtime notwithstanding the error. Wong has not demonstrated that he suffered any materially adverse action as a result of this incident.

Wong's claim (17) is that he was given an inadequate raise in January 2008. He believes that his raise was retaliatory and discriminatory because he received a raise of only .6%, whereas other employees who had less seniority and who trained fewer trainees received a raise of 1.8%. Wong Dep. at 105-08. Failure to give a raise could amount to a materially adverse action because this type of action may discourage employees from engaging in protected activity. However, Wong has not demonstrated a causal connection between the activity protected under Title VII and the adverse action: the inadequate raise. Wong has failed to show the causal connection either directly, through evidence of retaliatory animus or indirectly, "by showing that the protected activity was closely followed in time by the adverse action." *Cifra*, 252 F.3d at 216 (internal quotation marks and citation omitted). The conduct Wong complains of occurred in January 2008, a full two years after he first contacted an EEO counselor. Accordingly, this claim also fails.

Finally, Wong's claim (18) is that in May 2007, an Operational Error Development Procedure ("OEDP") was placed in his file without his or his supervisor's knowledge. An OEDP is a negative performance evaluation that notes "inadequacies" and offers advice to "rectify the situation." Wong Dep. at 109-10. It is not meant to be placed in an employee's file without his knowledge. *Id.* at 111. When his supervisor discovered the OEDP in Wong's file he ripped it out and tossed it in the garbage. *Id*. Although Wong could not point to any specific adverse affect or harm the OEDP caused, he speculated that it could have been a factor in determining whether he should be given the 1.8% raise. *Id*. at 112. Like claim (17), Wong has not established the requisite causal connection due to the long lapse in time between the protected activity and the adverse action.

CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety. The Clerk is directed to enter judgment for the defendants and to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated:          September 30, 2009
                Brooklyn, New York